Filed 5/7/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| KEEP OUR MOUNTAINS QUIET, | H039707 |
| Plaintiff and Appellant, | (Santa Clara County Super. Ct. No. 112CV221481) |
| v. | |
| COUNTY OF SANTA CLARA, | |
| Respondent; | |
| CANDICE CLARK WOZNIAK, as Trustee, etc., | |
| Real Party in Interest and Appellant. | |

The County of Santa Clara and the Board of Supervisors of the County of Santa Clara (collectively, the County) adopted a mitigated negative declaration and granted a use permit allowing real party in interest Candice Clark Wozniak, as trustee of the Candice Clark Wozniak Trust (the Trust), to host a limited number of weddings and other events on property located in the Santa Cruz Mountains (the Property). Respondent Keep Our Mountains Quiet (the Association), an unincorporated association of individuals who reside in the vicinity of the Property, successfully petitioned for a writ of mandate on the ground that the County violated the California Environmental Quality Act (CEQA)[1] in adopting the mitigated negative declaration instead of requiring an environmental impact report.

---

[1] CEQA is codified in the Public Resources Code, starting at section 21000.

The Trust appeals, arguing the County complied with CEQA. The County has not appealed. The Trust filed a separate appeal from a postjudgment order granting the Association attorney fees. The Association cross-appeals as to the attorney fee order. We have consolidated the appeals for purposes of this opinion. We affirm.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   *The Property*

The Property consists of 14.46 acres of land in the Santa Cruz Mountains. It is situated on Summit Road, also known as Highway 35, in Santa Clara County, adjacent to Santa Cruz County. Summit Road is within the jurisdiction of the California Department of Transportation (Caltrans). The Property houses vineyards for the Redwood Ridge Estates Winery, llama and alpaca grazing land, barns, and a residence where Candice Wozniak lives. Adjacent to the Property in Santa Clara County is the Bear Creek Redwoods Open Space Preserve (Open Space Preserve), which is owned by the Midpeninsula Regional Open Space District (Midpeninsula). The Open Space Preserve currently is open to the public by permit only. Midpeninsula plans to open the Open Space Preserve to the general public in the future and proposes to establish a network of hiking trails located 750 feet or more from the Property. The remainder of the area surrounding the Property is characterized by single-family residences on heavily wooded lots that are over two acres in size.

### B.   *Unpermitted Events*

Beginning in 2006, Wozniak hosted a number of weddings and other events on the Property without obtaining the necessary use permit from the County. Music and speech were amplified over a sound system during those events using speakers oriented to the southeast.

At an August 24, 2006 meeting with County officials, Wozniak stated that approximately 100 people typically attended events on her Property. A Web site advertising the Property as an event space represented there was seating for 200.

2

Complaints received by the county sheriff's office about events in 2006 indicated the events had more than 200 attendees. A zoning violation report cited accounts of wedding receptions with 300 attendees being held at the Property. Three weddings were held on the Property during one weekend in October 2006, each of which was attended by approximately 150 people.

The county sheriff's office received numerous calls from local residents complaining about the noise associated with unpermitted events at the Property. A number of residents also wrote to County officials to complain that they could hear announcements and loud music late into the night. Many of the complaining residents lived in the Santa Cruz County neighborhood of Marty Road, located about 3,000 feet south of the Property across a canyon.

The County sent Wozniak three letters during the summer of 2006 informing her that she "must cease" holding wedding receptions on the Property because a land use approval was required for such events.

### C. *The Project*

The Project involves a use permit authorizing 28 special events per year for 100 guests and 12 staff members to be held between the hours of 2:00 p.m. and 10:00 p.m. on Saturdays and Sundays between May 1 and September 30. Wozniak first applied for a use permit in December 2008. As discussed below, the County studied the Project for three years before adopting a mitigated negative declaration (MND) in December 2011.

### D. *Administrative Proceedings*

Following the preparation of an initial study, the County issued a notice of intent to adopt an MND on June 30, 2010. The County planning commission held a public hearing on the Project on August 5, 2010. The planning commission continued the Project to evaluate the many public comments it received regarding potential noise and traffic impacts. Following another continuation in September 2011, the planning commission adopted a revised MND and approved the use permit on December 1, 2011.

3

The mitigation measures set forth in the revised MND as conditions of project approval (and as conditions on the use permit) include, among others: (1) orienting the speakers away from neighboring residences and towards the Open Space Preserve, with specific placement to be approved by the planning office and reviewed by a noise consultant; (2) the provision and posting of a noise complaint telephone number; and (3) an annual report by the planning office assessing compliance with the conditions for at least the first year. As part of that compliance report, County staff is required to retain a qualified noise consultant, paid for by Wozniak, to conduct noise readings at a minimum of four random events. The mitigation measures authorize the planning commission to revoke or modify the use permit based on compliance with the foregoing conditions and to extend noise monitoring for at least one year if there is evidence reception noise exceeds the County noise ordinance or General Plan thresholds. The use permit also includes the condition that only one outdoor live band event, to be monitored by a County-retained noise consultant, be permitted during the first year of operation. "If the Planning Commission determines based on the monitoring results that the live band monitored noise meets the County Noise Ordinance Standards, the following years of operation may allow more outdoor live band events."

The Association appealed to the board of supervisors. Following a public hearing, the board of supervisors denied the appeal and affirmed the adoption of the revised MND and the approval of the use permit.

The following evidence was adduced during the administrative proceedings.

4

### E.     *Evidence of Noise Impacts*

#### 1.     *County Noise Standards*

The County's noise ordinance provides that between 7:00 a.m. and 10:00 p.m. in residential areas, exterior noise levels containing music must not exceed 70 dBA[2] and must not exceed 50 dBA for more than 30 minutes in any hour.  These noise levels must not be exceeded on *other* (i.e., neighboring) properties.  The noise ordinance does not apply to open space preserves.  The County's general plan provides exterior noise standards based on the average noise level measured over a 24-hour period (the day-night average sound level).  The general plan's limit for both residential areas and open space preserves is a day-night average sound level of 55 decibels (dB).  Santa Cruz County's General Plan provides that, between 7:00 a.m. and 10:00 p.m., exterior noise levels are not to exceed 70 dBA or an hourly average of 50 dBA.

#### 2.     *Wozniak's Sound Consultant*

Wozniak retained an acoustical consultant, Rosen, Goldberg, Der & Lewitz, Inc. (Rosen), to analyze the sound generated by three wedding receptions held on the Property during a single weekend in October 2006.  Rosen presented its findings in a report dated July 2008.

According to that report, at each wedding, there were approximately 150 attendees and a sound system with speakers pointed to the southeast was used to amplify recorded music and speech.  Throughout the weekend, Rosen monitored and documented the sound levels at two locations near the property line and in the direction of nearby homes.  In particular, the monitoring locations were south of where the wedding receptions were held, in the direction of the Marty Road neighborhood.

---

[2] The abbreviation dBA refers to A-weighted decibels, which express sound levels as perceived by the human ear.

Rosen concluded that the County's noise standards were not exceeded throughout the weekend. In compliance with the County's noise ordinance, the sound levels never exceeded 50 dBA for more than 30 minutes in any hour and wedding noise never exceeded 70 dBA. The highest noise level achieved for an extended period of time (30 minutes in any hour) was 45 dBA. In accordance with the County's general plan, the day-night average sound levels at the two locations were 49 dB and 48 dB, below the 55 dB limit. And, as required by the Santa Cruz County General Plan, the hourly average noise levels were below 50 dBA, at 48 dBA and 49 dBA.

### 3. The County's Sound Consultant

The County's acoustical consultant, Edward L. Pack Associates, Inc. (Pack), conducted a peer review of the Rosen noise analysis. In its review, Pack was "unable to concur that the events . . . unequivocally do not generate any significant noise impacts." Pack opined that the locations at which Rosen monitored the wedding noise were "topographically shielded." Pack further indicated Rosen failed to consider the potential impact of the acoustic spreading of sound waves from a loud speaker, sound reflected off the canyon walls, wind, and temperature inversion. Pack commented in its review that "[b]ands and DJ's at a wedding will typically play at 85-88 dBA Leq (average) at a distance of 20 ft. from the front of the stage and speakers."

Pack recommended the performance of one or more noise analyses of mock or real events using a DJ or band and vocal announcements typical of a wedding. Pack further recommended that noise level be measured at potentially affected residences, including those on Marty Road.

Pack conducted a mock wedding reception at the Property on June 11, 2011. A sound system was used to replicate DJ entertainment. The speakers were pointed north towards the Open Space Reserve. Sound level meters were set up at the homes of three neighbors and at the property line with the Open Space Preserve. A CD of popular music was played at an average of 82 dBA at 20 feet from the speakers; maximum sound levels

6

exceeded 90 dBA. Pack initially set the music to 85 dBA but lowered it because that level was "uncomfortably loud for a wedding reception."[3]

The music was "inaudible" at the three homes. Pack calculated the day-night average sound level at the Open Space Preserve's property line to be 45 dB.[4] Pack indicated that the average hourly sound level at the Open Space Preserve's property line was 52 dBA.[5] Pack opined that at Midpeninsula's planned hiking trails the day-night average sound level would be 34 dB and the hourly average noise level would be 41 dBA. Pack's raw data showed noise at the Open Space Preserve's property line reached a maximum of 70.1 dBA during the mock event.

Pack did not measure crowd noise at the mock event, but did attempt to analyze the sound created by wedding attendees using a mathematical model and crowd noise data collected at a wedding at another venue. Pack opined that the sound of the crowd cheering could be as loud as 52 dBA at a residence located 3,500 feet away on Marty Road. This level of noise would be "noticeable" but would not exceed the Counties' standards, according to Pack. Assuming a crowd cheers loudly eight times during an

---

[3] An e-mail from the County commenting on an earlier draft of Pack's report suggests the decision to turn down the music was prompted by Wozniak: "Second page, third paragraph starting with 'A CD of popular'--We need to reword this. How it's stated now appears to characterize that Ms. Wozniak dictated the parameters of the noise study, which can't be the case. Could mention feedback from Ms. Wozniak on how she monitors noise but the mention that the music was turned down based on her suggestion will be very damaging." The final report stated that Wozniak had no "influence on the music program/equipment or operations used for this study."

[4] Wozniak leases a portion of the Open Space Preserve for llama grazing. The day-night average sound level was 45 dB at the fence line between the llama grazing area and the rest of the Open Space Preserve. The day-night average sound level was 49 dB at the fence line between the Property and the llama grazing area.

[5] The average hourly sound level was 56 dBA at the fence line between the Property and the leased llama grazing area.

7

event, for five seconds each time, the hourly average noise level at the Marty Road residence would be 32 dBA.

At the Open Space Preserve, the hourly average noise level from the crowd noise would be 51 dBA at the fence line between the Property and the llama grazing area, 37 dBA at the fence line between the llama grazing area and the rest of the Open Space Preserve, and 26 dBA at the proposed hiking trails. The day-night average sound level would be 38 dB at the fence line between the Property and the llama grazing area, 23 dB at the fence line between the llama grazing area and the rest of the Open Space Preserve, and 12 dB at the proposed hiking trails.

As to a live band, Pack opined that "sound levels would likely comply with the Santa Clara County and Santa Cruz County noise standards, [but] they would be noticeable at times." Pack indicated that sound levels at neighboring residences would be 10 dB higher with a band as compared to a DJ.

### 4. *The Association's Sound Consultant*

The Association retained an acoustic consultant, The Acoustics & Vibration Group, Inc., to review Pack's noise analyses. The Acoustics & Vibration Group criticized Pack for playing music at 82 dBA during the mock event instead of at 85 to 88 dBA, which Pack characterized as typical for wedding DJs in its peer review of the Rosen study. Relatedly, the consultant suggested the mock event may have been inaudible at neighboring residences, not because the speakers were oriented away from them, but because the mock event was unrealistically quiet. The Association's acoustic consultant further opined that the County's noise requirements for the Open Space Preserve would have been exceeded had the music been played louder, at 88 dBA.

### 5. *Public Comments Regarding Noise*

Neighbors commented on the Project at planning commission hearings and by declaration and letter. Many complained about the noise they experienced during the unpermitted weddings in 2006. One Marty Road resident described hearing "pounding

8

music, shouted announcements, celebratory screams, hoots, cheers, and clapping" during those events. Another neighbor stated that noise from the 2006 events was "quite audible in our closed house, with the hollers of the crowd soaring above and the throbbing bass notes reaching below any noise (such as the TV) we tried to employ to cover it." Other neighbors declared that during the 2006 events, "lower frequencies from the amplified music, public address system and crowd penetrated the walls and windows of our home with such intensity that we could feel the resulting vibrations while sitting in our family room . . . or lying in bed." Neighbors who were home during the mock event acknowledged not hearing it, but concluded it was not representative of actual events held on the Property.

One Marty Road couple, the Matlocks, addressed a wedding held on the Property on August 7, 2010. They stated that they could hear "pounding music and loud cheers" from the wedding, which led them to call the sheriff to report the noise. Wozniak's counsel told the planning commission at its December 1, 2011 hearing that for the August 7, 2010 wedding "[t]he number [of attendees was] kept down" and Wozniak "tried to . . . comply with the draft conditions." The Matlocks stated at the same hearing that a video of the event shows the speakers were oriented away from their home, "exactly the setup the permit seeks to approve." The Matlocks stated that, unlike the August 7, 2010 wedding, they could not hear the mock event at their home.

### 6. *Midpeninsula Letters*

Midpeninsula expressed concern about the noise impacts the Project would have on visitors and wildlife in the Open Space Preserve. Midpeninsula noted that "studies by a research group at De Anza College have documented mountain lions and bobcats in the Preserve, species whose movement and behavior may be negatively affected by amplified sound nearby particularly in the evening and twilight hours."

9

### F. Evidence of Traffic Impacts

#### 1. Expert Analyses and Caltrans's Position

Wozniak retained Hexagon Transportation Consultants, Inc. (Hexagon) to perform a traffic operations analysis regarding the Project. According to Hexagon's August 12, 2009 report, the purpose of its analysis was to evaluate whether the Project would "require a separate eastbound left turn pocket from Summit Road to the project driveway." After monitoring traffic on Summit Road, Hexagon concluded that no left turn pocket would be required due to the low volume of traffic on Summit Road. Hexagon noted that Summit Road is a "lightly used roadway, with a Saturday peak period between 5:00 pm and 6:00 pm of approximately one vehicle every two minutes."

In a letter dated January 14, 2011, Caltrans responded to Hexagon's report. It opined that "[t]he increased traffic [associated with the Project] will have significant impacts to the operations and traffic movements to the site entrances" and "might impede [Summit Road] in both directions because of numerous vehicles making right and left turns into the site." Caltrans requested "more data and analysis clearly illustrating the traffic conditions impacting the site driveways and the [Summit Road]/[Highway] 17 intersection during the weekend conditions."

Hexagon provided a supplemental report on February 15, 2011. Hexagon explained that Summit Road carries less than 400 vehicles per day on weekends, 36 of which pass during what Hexagon deemed to be the "peak event hour" of 5:00 p.m.[6] Hexagon opined that the Project would add 43 vehicles during the peak event hour. As to the Summit Road/Highway 17 interchange, Hexagon concluded the Project would have

---

[6] Hexagon deemed 5:00 p.m. to be the peak event hour because it was under the impression the Project involved "special events on Saturday from 5:00 pm to 10:00 pm" and it opined most people arrive in the hour prior to an event beginning. In fact, the Project involves a use permit authorizing events between the hours of 2:00 p.m. and 10:00 p.m. Presumably, the start time of any given event--and thus the peak event hour--may vary.

10

no discernible impact, as it would add "at most, 35 peak-hour vehicles" to the interchange, which would be split between northbound and southbound vehicles.

The Association's traffic consultant, James C. Jeffery, conducted a peer review of Hexagon's August 12, 2009 report. Jeffery noted that Summit Road is narrow (specifically, it lacks centerline striping in the vicinity of the Project, meaning the road is less than the standard 24 feet wide) and curvy and that the Property's driveway is not perpendicular to the road. He criticized Hexagon for failing to discuss these roadway conditions and indicated "there needs to be a review of the possible limited sight distance at the roadway/driveway junction." Jeffery opined that the projected increase in traffic associated with the Project "would likely compound the traffic safety issues" posed by the narrow, curvy road and skewed driveway. In his view, given the usually low traffic volume on Summit Road, "any projected traffic increase would likely have an impact."

On August 31, 2011, Caltrans e-mailed the County regarding both Hexagon's February 2011 report and Jeffery's peer review. Caltrans "accepted" Hexagon's report with regard to traffic volumes and peak hour conclusions. However, the agency "remain[ed] concerned regarding potentially significant impacts to safety based on line of sight, sight distance, turning radii and other potential issues that appear to accompany this project." Caltrans indicated that the issues Jeffery raised were "under the purview of [its] Encroachment Permits office" and that its own concerns "(line of sight, sight distance, turning radius) [would] be . . . addressed" in the context of an Encroachment Permit application.

Hexagon responded to Jeffery's critiques in a September 12, 2011 memorandum. As to the nature of Summit Road, Hexagon stated that a "preliminary review" of state traffic records showed there were "no significant accident issues" on the stretch of Summit Road where no centerline is present, and opined that the Project would not add sufficient traffic to change the character of the roadway.

11

Caltrans remained concerned about possible traffic safety issues associated with the Project on September 27, 2011, as "a safety review . . . revealed an accident history that is twice the statewide average."[7]  Caltrans expressed "concern over how these conditions may be exacerbated by the addition of a driveway and the use of alcohol."

At the end of October 2011, Caltrans informed the County by e-mail that "[o]ur office of Traffic Safety has examined [Hexagon's] report and reviewed the data sources. The study appears to be in order, and we have no further comments at this time."  In response to the County's request that Caltrans confirm "there are no significant traffic or road safety impacts," Caltrans stated "the consultant's study and addenda satisfy our concerns at this time."  Caltrans  noted that "additional evaluation must be performed when the Encroachment Permit review occurs."

### 2.    *Public Comments Regarding Traffic*

Members of the public expressed concerns about the Project's impact on traffic at planning commission hearings and by declaration and letter.  At one public hearing, a resident stated:  "From Bear Creek Road to [the Property] there are 19 blind curves. . . . [¶] And from [the Property] to Highway 17, there's another 20 blind curves. . . .  I measured [Summit Road and t]here's a place where [it] is nine feet six inches wide. . . . There are no, no graded shoulders, no paved shoulders."  Other residents commented that joggers, cyclists, and dog walkers frequent the stretch of Summit Road near the Property despite the lack of shoulders.

### G.    *Judicial Proceedings*

The Association filed a petition for writ of mandate seeking to require the County to prepare an Environmental Impact Report (EIR) and alleging planning and zoning law

---

[7] The parties have pointed to nothing in the record resolving the apparent discrepancy between Hexagon and Caltrans regarding the frequency of accidents along Summit Road near the Property.

violations. In an order filed on January 25, 2013, the superior court ordered the County to prepare an EIR, finding substantial evidence supported a fair argument that the Project may cause significant noise and traffic impacts. The court did not address the planning and zoning law violations, deeming them moot. The Trust timely appealed.

The trial court granted in part the Association's motion for attorney fees. The court awarded the Association $145,747 under Code of Civil Procedure section 1021.5, compensating it for only a portion of the hours it claimed and denying a multiplier. The Trust timely appealed the fee award. The Association timely cross-appealed as to the fee award. This court consolidated the appeal on the merits and the appeal on the fee motion.

## II. DISCUSSION

### A. *Motion to Strike the Opening Brief*

Below, the County was the respondent but it did not appeal. Nevertheless, the opening brief was filed on behalf of the Trust as well as the County.

The Association moved to strike the opening brief, arguing it violated rule 8.200(a) of the California Rules of Court because the County is not an appellant. The Association does not contend that the Trust lacks standing to assert any of the arguments advanced in the opening brief. Instead, it suggests the Trust be permitted to refile the opening brief without listing the County as a party to it.

Having not appealed, the County cannot be considered an appellant. Accordingly, it is not entitled to file an opening brief. (Cal. Rules of Court, rule 8.200(a)(1).) And while rule 8.200(a)(5) of the California Rules of Court permits parties to join in or adopt part or all of another party's briefs, " 'a respondent who has not appealed from the judgment may not urge error on appeal.' " (*Estate of Powell* (2000) 83 Cal.App.4th 1434, 1439.) Thus, it would make little sense to allow a respondent to join in or adopt portions of an appellant's brief that attack the judgment below. Code of Civil Procedure section 906 provides a limited exception to the rule that a respondent may not urge error; it allows a respondent to "request the reviewing court to . . . review [the judgment] for the

13

purpose of determining whether or not the appellant was prejudiced by the error or errors upon which he relies for reversal or modification of the judgment from which the appeal is taken." "The purpose of the statutory exception is to allow a respondent to assert a legal theory which may result in affirmance of the judgment." (*California State Employees' Assn. v. State Personnel Bd.* (1986) 178 Cal.App.3d 372, 382, fn. 7.) It has no application here, as the opening brief seeks reversal. In sum, neither rule 8.200(a)(5) of the California Rules of Court, nor Code of Civil Procedure section 906, permits the nonappealing parties to join, adopt, or sign the Trust's opening brief.

Nevertheless, we decline to strike the brief. Instead, we shall disregard the County's signature.

The Association also complains that the Trust's opening brief does not comply with rule 8.204(a)(2)(B) of the California Rules of Court, which requires an appellant's opening brief to "[s]tate that the judgment appealed from is final, or explain why the order appealed from is appealable." We agree that the opening brief does not contain such a statement but exercise our discretion under rule 8.204(e)(2)(C) of the California Rules of Court to disregard that noncompliance.

As a final procedural issue, the Association contends we should affirm because the Trust never filed an answer to the petition for writ of mandate. For that contention, the Association relies on the principle of law that, where "no answer [to a petition for writ of mandate is] filed, the court may hear the case on the papers of the applicant." (*Azeria v. California Adult Authority* (1961) 193 Cal.App.2d 1, 3; see also Code Civ. Proc., § 1094.) Here, no answer was filed but the petition for writ of mandate was fully briefed. The Association fails to explain how *Azeria* applies under these circumstances, nor does it contend that it raised *Azeria* below. Accordingly, we consider the argument forfeited. (*Berger v. Godden* (1985) 163 Cal.App.3d 1113, 1120 ["appellant's failure to present any pertinent or intelligible legal argument in his opening brief constitutes an abandonment of

14

the appeal"]; *Kaufman & Broad Communities*, *Inc*. *v*. *Performance Plastering*, *Inc*. (2006) 136 Cal.App.4th 212, 226 [arguments not raised below are forfeited].)

## B.    Overview of CEQA

" '[T]he overriding purpose of CEQA is to ensure that agencies regulating activities that may affect the quality of the environment give primary consideration to preventing environmental damage.' " (*Save Our Carmel River v*. *Monterey Peninsula Water Management Dist*. (2006) 141 Cal.App.4th 677, 687.)  Where the statute applies, the relevant governmental agency must conduct an initial study to determine " 'if the project may have a significant effect on the environment.' " (*Id*. at p. 688 quoting CEQA Guidelines, § 15063, subd. (a).)[8] " 'Significant effect on the environment' means a substantial, or potentially substantial, adverse change in any of the physical conditions within the area affected by the project including land, air, water, minerals, flora, fauna, ambient noise, and objects of historic or aesthetic significance." (Guidelines, § 15382.)

There is no "ironclad definition of [what constitutes a] significant effect"; "[t]he determination of whether a project may have a significant effect on the environment calls for careful judgment on the part of the public agency involved." (Guidelines, § 15064, subd. (b).)  "[I]n marginal cases where it is not clear whether there is substantial evidence that a project may have a significant effect on the environment, the lead agency shall be guided by the following principle:  If there is disagreement among expert opinion supported by facts over the significance of an effect on the environment, the Lead Agency shall treat the effect as significant and shall prepare an EIR." (*Id*., subd. (g).)

If the initial study uncovers "substantial evidence that any aspect of the project, either individually or cumulatively, may cause a significant effect on the environment," it must prepare an EIR.  (Guidelines, § 15063, subd. (b)(1).)  An EIR is required whenever

_____

[8] CEQA Guidelines ("Guidelines") are contained at California Code of Regulations, title 14, section 15000, et seq.

" 'substantial evidence in the record supports a "fair argument" significant impacts or effects may occur.' " (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1421.)  If, on the other hand, there is "no substantial evidence that the project or any of its aspects may cause a significant effect on the environment," the agency prepares a negative declaration.  (Guidelines, § 15063, subd. (b)(2).)  Alternatively, if " 'the initial study identifies potential significant effects on the environment but revisions in the project plans "would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would occur" and there is no substantial evidence that the project as revised may have a significant effect on the environment, a mitigated negative declaration may be used.' " (*Architectural Heritage Assn. v. County of Monterey* (2004) 122 Cal.App.4th 1095, 1101 (*Architectural Heritage*).)

In the CEQA context, substantial evidence "means enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).)  Substantial evidence includes "facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts" (*id.*, subd. (b)), but not "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly erroneous or inaccurate, or evidence of social or economic impacts which do not contribute to or are not caused by physical impacts on the environment." (*Id.*, subd. (a).)

"Relevant personal observations of area residents on nontechnical subjects may qualify as substantial evidence." (*Pocket Protectors v. City of Sacramento* (2004) 124 Cal.App.4th 903, 928.)  "For example, an adjacent property owner may testify to traffic conditions based upon personal knowledge." (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 173.)  Because substantial evidence includes "reasonable assumptions predicated upon facts" (Guidelines, § 15384,

16

subd. (b)) and "reasonable inferences" (*id*., subd. (a)) from the facts, factual testimony about existing environmental conditions can form the basis for substantial evidence.[9] (Guidelines, § 15384; *Banker's Hill*, *Hillcrest*, *Park West Community Preservation Group v*. *City of San Diego* (2006) 139 Cal.App.4th 249, 274 (*Banker's Hill*) ["local residents may testify to their *observations* regarding **existing** traffic conditions"], bold emphasis added.)  For instance, in *Taxpayers for Accountable School Bond Spending v*. *San Diego Unified School Dist*. (2013) 215 Cal.App.4th 1013, 1054, resident testimony regarding traffic congestion and accidents associated with events at a school stadium constituted substantial evidence supporting a fair argument that a plan to allow night games (that would draw larger crowds) may have a significant traffic impacts.  The testimony constituted substantial evidence because "any traffic problems experienced in the past logically will only be exacerbated if the Project is completed and evening football games are held." (*Id*. at p. 1055.)  In other words, one reasonably can infer a project will have a significant impact on traffic from factual testimony regarding past traffic congestion caused by similar projects.  However, " 'in the absence of a specific factual foundation in the record, dire predictions by nonexperts *regarding the consequences of a project*' "--such as that it would exacerbate an already dangerous

---

[9] The League of California Cities and the California State Association of Counties (collectively, amici curiae) filed an amicus brief in support of the Trust, which focuses on what types of evidence constitute substantial evidence for purposes of CEQA.  With respect to citizen testimony, amici curiae contend statements "concerning existing environmental conditions . . . cannot be equated with evidence of significant project effects."  We agree that testimony about current conditions is not proof of what impacts a future project will have.  But "the question is not whether [citizen testimony] constitutes proof that [particular effects] *will* occur," but whether it (or reasonable inferences from it) "constitutes substantial, credible evidence that supports a *fair argument* that . . . [the project] *may* have a significant impact on the environment." (*Rominger v*. *County of Colusa* (2014) 229 Cal.App.4th 690, 721 (*Rominger*).)  As discussed above, factual testimony about existing environmental conditions can *form the basis for* substantial evidence supporting a *fair argument* that significant impacts or effects *may* occur.

17

intersection--" 'do not constitute substantial evidence.' " (*Banker's Hill*, *supra*, at p. 274; *Leonoff v. Monterey County Bd. of Supervisors* (1990) 222 Cal.App.3d 1337, 1352 (*Leonoff*) [citizen comments consisting of "unsubstantiated conclusions about traffic being dangerous near the project site" without stated "factual bas[e]s . . . do not rise to the level of substantial evidence supporting a fair argument of significant environmental effect"].)

### C. *Standard of Review and Contentions on Appeal*

We review the County's efforts to comply with CEQA for prejudicial abuse of discretion. (*Architectural Heritage*, *supra*, 122 Cal.App.4th at p. 1109.) An agency abuses its discretion where it fails to proceed in a manner required by law or its determination is not supported by substantial evidence. (*Ibid*.) In reviewing the adoption of an MND, our task is to determine whether there is substantial evidence in the record supporting a fair argument that the Project will significantly impact the environment; if there is, it was an abuse of discretion not to require an EIR. (*Ibid*.) " 'Whether a fair argument can be made is to be determined by examining the entire record.' " (*Ibid*.)

The Trust contends there is no substantial evidence in the record supporting a fair argument that the Project will have significant noise or traffic impacts, such that the trial court erred in granting the Association's petition for writ of mandate. We address each area of concern in turn.

### D. *Noise Impacts*

As an initial matter, the parties dispute what constitutes a "significant" noise impact. The County employed the noise standards set forth in its noise ordinance and General Plan as the thresholds for significant noise exposure, deeming any increase to be insignificant so long as the absolute noise level did not exceed those standards. The Trust defends that approach as "common practice." The Association urges that " 'conformity with a general plan does not insulate a project from EIR review where it can be fairly

argued that the project will generate significant environmental effects.' " (*Citizens for Responsible & Open Government v. City of Grand Terrace* (2008) 160 Cal.App.4th 1323, 1338 [General Plan noise standard], quoting *Oro Fino Gold Mining Corp. v. County of El Dorado* (1990) 225 Cal.App.3d 872, 881-882 [same]; *Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1381 (*Berkeley Jets*) ["the fact that residential uses are considered compatible with a noise level of 65 decibels for purposes of land use planning is not determinative in setting a threshold of significance under CEQA"].) The weight of authority favors the Association on this point. (*Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1416 [a project's effects can be significant even if "they are *not* greater than those deemed acceptable in a general plan"]; *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350, 354 ["CEQA nowhere calls for evaluation of the impacts of a proposed project on an existing general plan"].) Accordingly, an EIR is required if substantial evidence supports a fair argument that the Project may have significant unmitigated noise impacts, even if other evidence shows the Project will not generate noise in excess of the County's noise ordinance and General Plan.

The Association contends the County should have focused on the magnitude of the increase in ambient noise levels caused by the Project, relying on appendix G of the CEQA Guidelines. Appendix G contains an " ' "Environmental Checklist Form" . . . designed to be used as an initial study to determine if a project may have a significant effect on the environment.' " (*Rominger*, *supra*, 229 Cal.App.4th at p. 715; Guidelines, § 15063, subds. (a) & (f).) " 'The checklist consists of sample questions divided into categories of potential physical impacts a project may have.' " (*Rominger*, *supra*, at p. 715.) With respect to noise, the appendix G checklist asks whether the project would result in "[a] substantial temporary or periodic increase in ambient noise levels in the project vicinity above levels existing without the project." (Guidelines, appen. G, § XII, subd. (d).) We agree that the lead agency should consider both the increase in noise level

19

and the absolute noise level associated with a project. (*Environmental Planning & Information Council v. County of El Dorado*, *supra*, 131 Cal.App.3d at p. 354 [CEQA "concerns itself with the impacts of the project on the environment, defined as the existing physical conditions in the affected area"]; Pub. Resources Code, § 21060.5 [defining environment]; *Berkeley Jets*, *supra*, 91 Cal.App.4th at p. 1382 [concluding the "potential noise impact of increased nighttime flights mandate[d] further study"]; *id.* at pp. 1381-1382 [where there had been no "meaningful analysis of existing ambient noise levels"].) With this framework in mind, we turn to the evidence of noise impacts.

We begin by considering the impact of event-related noise on neighboring residents. There is substantial evidence in the record supporting a fair argument that music played by a DJ during events on the Property may have significant noise impacts on surrounding residents. One neighboring couple, the Matlocks, stated that they could hear "pounding music" from a wedding held on August 7, 2010, despite a video showing the speakers were oriented away from their home, as called for by the MND and use permit. At a planning commission hearing, the Matlocks represented that the DJ set up during the August 2010 wedding was "exactly the setup the permit seeks to approve." Wozniak's counsel did not disagree. In fact, he appears to have corroborated that the speakers were pointed towards the Open Space Preserve during the August 2010 wedding, telling the planning commission that Wozniak "tried to . . . comply with the draft conditions" during that event. Significantly, the Matlocks acknowledged that the mock event was inaudible at their home. The Matlocks' comments cast doubt on whether the mock event was representative of a real wedding featuring DJ entertainment and constitutes substantial evidence supporting a fair argument that the Project may have unmitigated noise impacts.

With respect to outdoor live music, we reach a similar conclusion. The only evidence as to the potential noise impacts of a live band event are Pack's opinions that band noise would be 10 dB louder than a DJ at neighboring residences, would be

20

"noticeable" at those residences, and would "*likely*" comply with the Santa Clara County and Santa Cruz County noise standards. That evidence, combined with the Matlocks's comments as to the volume of a DJ event at their home, supports a fair argument that the Project may have a significant environmental noise impact. While the use permit allows only one live band event in the first year and more in future years only if the noise from that event complies with the County's noise ordinance, compliance with the ordinance does not foreclose the possibility of significant noise impacts.

Turning to crowd noise, substantial evidence in the record supports a fair argument that Project-related crowd noise may have significant noise impacts on surrounding residents. Multiple residents testified to the crowd noise associated with prior events at the Property, including "celebratory screams, hoots, cheers, . . . clapping" and "hollers" that could be heard even inside neighboring homes. The Trust characterizes those prior events as "much larger" than those authorized by the use permit. While there is evidence indicating some of the prior events had between 150 and 300 attendees[10] (well over the 100 attendee limit imposed by the use permit), Wozniak informed County officials that approximately 100 people typically attended events on her Property in 2006. That evidence, combined with resident testimony about crowd noise, supports a fair argument that the Project may have a significant environmental noise impact.[11]

---

[10] The Rosen report shows some weddings had as many as 150 attendees. The evidence for more than 150 attendees is hardly as definitive as the Trust suggests. A Board of Supervisors Staff Report references "complaint reports received by the County Sheriff" for the 200 attendee figure. A zoning violation report states "[r]eported having wedding receptions at site w/300 persons." It appears these figures may be based on estimates given by neighbors who complained about events on the Property.

[11] The County's noise expert opined that crowd noise at nearby residences would be "noticeable" but in compliance with the County's noise ordinance and General Plan at 52 dBA. As noted, that compliance alone is not dispositive on the question of whether (continued)

21

The Association also complains about potential noise impacts on biological resources and visitors in the Open Space Preserve. As to biological resources, the record contains evidence mountain lions and bobcats live in the Open Space Preserve and a study submitted by the Association indicating noise may have negative effects on wild animals, including stress-related illness, abandonment of favored habitats, and population declines. There also is evidence noise levels at the property line with the Open Space Preserve reached 70.1 dBA during the mock event. Together, this evidence supports the reasonable inference that the Project may have significant impacts on biological resources.

By contrast, there is no substantial evidence supporting a fair argument that the Project may have significant noise impacts on visitors to the Open Space Preserve. The Open Space Preserve is open to the public by permit only; no evidence was submitted as to the frequency with which such permits are issued or how close permit holders may get to the Property. While Midpeninsula plans to establish trails and open the Open Space Preserve to the public at some unspecified time in the future, a "negative declaration 'must focus on impacts to the existing environment, not hypothetical situations.' " (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 322; *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 658 ["the baseline environmental setting must be premised on realized physical conditions on the ground"]; Guidelines, § 15126.2, subd. (a) ["In assessing the impact of a proposed project on the environment, the lead agency should normally limit its examination to changes in the existing physical conditions in the affected area"].) Thus, we need not consider the impacts on hypothetical users of nonexistent trails.

---

there exists a fair argument that Project-related crowd noise may have significant noise impacts.

22

*E*.    ***Traffic Impacts***

Based on our review of the record, we conclude there is substantial evidence to support a fair argument that the Project may have a significant impact on traffic and thus the environment.  As described below, such an argument finds support in evidence the Project will--at times--double traffic volume on a narrow, windy, substandard road with a history of accidents.

Appendix G to the CEQA Guidelines recommends that, in determining whether a project will have significant traffic impacts, lead agencies consider whether it will "[s]ubstantially increase hazards due to a design feature (e.g., sharp curves or dangerous intersections) or incompatible uses (e.g., farm equipment)?"  (Guidelines, appen. G, § XVI, subd. (d).)  Neighbors and the Association's expert provided factual information indicating the design feature-related hazards exist on Summit Road in the vicinity of the Property, including stretches of road that are narrower than the standard 24 feet wide (and absence of centerline striping in those stretches), a lack of graded or paved shoulders, and more than 30 blind curves.  At one location, Summit Road is only nine feet six inches wide.  Contrary to the Trust's contention, neighbors did not "simply claim that roads utilized by the project are already crowded and unsafe" or offer the sort of "unsubstantiated conclusions" held to be insufficient in *Leonoff*, *supra*, 222 Cal.App.3d at page 1352.  Instead, those whose testimony we have cited related facts about road conditions based upon their personal knowledge.  Hexagon's reports show the Project will cause traffic volumes on Summit Road to more than double during the hours when guests arrive and depart.[12]  Together, the foregoing evidence supports a fair argument that

---

[12] Hexagon opined that events contemplated under the Project would generate an increase in vehicle traffic of 43 vehicles in the hour prior to the event start.  (Although not addressed by Hexagon, logic dictates the same traffic increase would occur in the hour after the event ended.)  Hexagon concluded that between 5:00 and 6:00 p.m. on Saturdays (the time on Saturdays when traffic on Summit is heaviest), there usually are 36 vehicle trips.

increased traffic from the Project will substantially increase existing design feature-related hazards.

A Caltrans "safety review . . . revealed an accident history [in the vicinity of the Project] that is twice the statewide average." While Caltrans apparently concluded the Project posed no significant traffic or road safety impacts, evidence of a heightened accident rate in the area supports a fair argument that doubling the traffic volume for two hours on event days (including one hour after dark) may have a significant impact on traffic safety.[13]

Taken together, the foregoing evidence supports a fair argument the Project may have significant traffic impacts. Thus, the County abused its discretion in failing to require an EIR addressing the potentially significant traffic impact of the Project.

*F*. *Attorney Fees*

The Trust contends the Association is not entitled to attorney fees under Code of Civil Procedure section 1021.5 (hereafter section 1021.5). In its cross-appeal, the Association maintains the trial court erred in refusing to apply a multiplier.

*1. Section 1021.5*

Section 1021.5 "provide[s] courts with the statutory authority to award attorney fees under a private attorney general theory." (*Bui v. Nguyen* (2014) 230 Cal.App.4th 1357, 1364 (*Bui*).) "The doctrine's purpose 'is to encourage suits enforcing important public policies by providing substantial attorney fees to successful litigants in such cases.' " (*Children & Families Com. of Fresno County v. Brown* (2014) 228 Cal.App.4th 45, 55.) A plaintiff is eligible for attorney fees under section 1021.5 when four criteria

---

[13] Caltrans' sign off is not as persuasive as the Trust contends, particularly given the lack of any explanation for why the agency concluded the Project posed no significant traffic or road safety impacts. Moreover, Caltrans' conclusory e-mail approval does not rebut, contradict, or diminish the reliability or credibility of the evidence that of Summit Road is narrow, curvy, and has many blind corners.

are met: (1) the action " 'has resulted in the enforcement of an important right affecting the public interest' "; (2) " 'a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons' "; (3) private enforcement was necessary; and (4) the financial burden of private enforcement warrants subsidizing the successful party's attorneys. (*Bui*, *supra*, at p. 1365.) "The moving party bears '[t]he burden [of] establish[ing] each prerequisite to an award of attorney fees under section 1021.5.' " (*Ibid.*)

Where attorney fees are awarded under section 1021.5, "the fee setting inquiry ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." (*Building a Better Redondo*, *Inc*. *v*. *City of Redondo Beach* (2012) 203 Cal.App.4th 852, 870.) "Next, the court engages in the multiplier analysis, and determines whether the lodestar figure should be augmented or diminished by one or more relevant factors" (*Cates v*. *Chiang* (2013) 213 Cal.App.4th 791, 820), "including: '(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award.' " (*Id*. at p. 822.)

"Generally, an order granting or denying attorney fees under section 1021.5 is reviewed for abuse of discretion." (*Bui*, *supra*, 230 Cal.App.4th at p. 1367.) "[T]he award will be upheld unless ' "there is no substantial evidence to support the trial court's findings or when there has been a miscarriage of justice. If the trial court has made no findings, the reviewing court will infer all findings necessary to support the judgment and then examine the record to see if the findings are based on substantial evidence." ' " (*Id*. at p. 1368.)

### 2. *Entitlement to Attorney Fees*

The Trust's challenge to the attorney fee award is based on the second and fourth criteria for an award of fees under section 1021.5--the significant benefit and financial

burden requirements.

"[T]he 'significant benefit' that will justify an attorney fee award [under section 1021.5] need not represent a 'tangible' asset or a 'concrete' gain but, in some cases, may be recognized simply from the effectuation of a fundamental constitutional or statutory policy." (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 939 (*Woodland Hills*).) Because "the public always has a significant interest in seeing that legal strictures are properly enforced . . . , in a real sense, the public always derives a 'benefit' when illegal private or public conduct is rectified." (*Ibid.*) However, "the Legislature did not intend to authorize an award of attorney fees in every case involving a statutory violation." (*Ibid.*) Accordingly, the trial court must "determine the significance of the benefit, as well as the size of the class receiving benefit, from a realistic assessment, in light of all the pertinent circumstances, of the gains which have resulted in a particular case." (*Id.* at pp. 939-940.)

In the CEQA context, courts have held that actions requiring a governmental agency to analyze or reassess environmental impacts associated with a proposed project confer a significant benefit. (See *Environmental Protection Information Center v. Department of Forestry & Fire Protection* (2010) 190 Cal.App.4th 217, 235 [litigation conferred significant benefit where it required resubmitted sustained yield plan, which would "more accurately analyze the impacts of the proposed logging on individual planning watersheds"]; *RiverWatch v. County of San Diego Dept. of Environmental Health* (2009) 175 Cal.App.4th 768, 782 (*RiverWatch*) [members of the public living and working near the proposed project site benefitted from trial court's ruling, which required agency to further analyze project's environmental impacts]; *Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 880 [residents potentially impacted by project significantly benefitted from peremptory writ of mandate requiring County to set aside EIR and conduct more in-depth analysis of project's impact

26

on air quality and water supply]; *Coalition for L.A. County Planning etc. Interest v. Board of Supervisors* (1977) 76 Cal.App.3d 241, 248, fn. 7 [actions invalidating EIR as inadequate benefitted county residents by requiring "a reasoned consideration of alternatives to the plan as well as the assurance that relevant state declared policies have not been ignored"].)  Similarly, as a result of this action, the County will be required to " 'identify and analyze the significant effects on the environment, state how those impacts can be mitigated or avoided, and identify alternatives to the project' " in the course of preparing an EIR.  (*California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 979.)

We are not persuaded by the Trust's contention that the litigation has not conferred a significant benefit because the trial court did not require the County to perform any additional studies for the EIR or impose any new mitigation measures.  It is true that the Project might be approved without modification even if it is determined it will have significant effects on the environment.  (*California Native Plant Society v. City of Santa Cruz*, *supra*, 177 Cal.App.4th at p. 982 ["a project with significant environmental impacts may be approved only if the decisionmaking body finds (1) that identified mitigation measures and alternatives are infeasible and (2) that unavoidable impacts are acceptable because of overriding considerations"].)  But even "[i]f that [occurs,] it would still be true that the residents of the county would have had the benefit of a reasoned consideration of alternatives to the [Project] as well as the assurance that relevant state declared policies have not been ignored."  (*Coalition for L.A. County Planning etc. Interest v. Board of Supervisors*, *supra*, 76 Cal.App.3d at p. 248, fn. 7.)  The significant benefit justifying an award of fees is the proper assessment of the environmental impacts associated with the Project.  (*RiverWatch*, *supra*, 175 Cal.App.4th at p. 781.)

The Trust's reliance on *Concerned Citizens of La Habra v. City of La Habra* (2005) 131 Cal.App.4th 329 is misplaced.  There, the trial court found a " 'minute

blemish' " (*id*. at p. 333) in the CEQA analysis that "probably c[ould] be repaired" (*ibid*.) without the preparation of an EIR and "was not likely to change the project." (*Id*. at p. 335.) Here, the trial court determined the MND was invalid and an EIR should have been prepared.

The Trust also argues the size of the class receiving any benefit consists of only neighboring property owners and is too small to justify an award of fees. We disagree. The preservation of biological resources and the safety of public roadways are of interest to the general public. The trial court reasonably could have concluded this suit conferred a significant benefit on the general public by requiring the County to further assess these "important environmental consideration[s]." (*RiverWatch*, *supra*, 175 Cal.App.4th at p. 782 ["The significant benefit criterion is satisfied where, as here, the litigation permits affected parties to provide additional input on remand--in this case, to voice their concerns about environmental impacts on water sources, traffic and mitigation plans involving open space."].)

For the foregoing reasons, we discern no abuse of discretion in the determination that the benefit conferred here is sufficiently significant to warrant an award under section 1021.5.

### b. Financial Burden

The financial burden criterion requires " 'the cost of the claimant's legal victory [to] transcend[] his personal interest.' " (*Woodland Hills*, *supra*, 23 Cal.3d at p. 941.) " 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.' " (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1215.) In *Whitley*, the Supreme Court laid out "[t]he method for weighing costs and benefits." (*Ibid*.) It explained that " '[t]he trial court must first fix--or at least estimate--the monetary value of the benefits obtained by the successful litigants themselves . . . [; second,] discount these total benefits by some estimate of the probability of success at the time the vital litigation decisions were made which eventually produced the successful outcome . . . . [¶] [; third,

28

determine] the costs of the litigation . . . [; and finally, award fees unless] the expected value of the litigant's own monetary award exceeds by a substantial margin the actual litigation costs.' " (*Id*. at pp. 1215-1216.)

Here, neither the Association nor its members enjoyed any direct pecuniary benefit from the litigation. The Trust argues Association members obtained an indirect pecuniary benefit--avoiding reductions in their property values. The Trust points out that many of the Association's members declared in writing that if the Project was approved it would reduce the value of their homes. No evidence was submitted attempting to quantify any potential property value reductions. The Trust posits that the suit prevented losses equal at least $500,000, but that figure is based on conjecture, not fact.[14]

"Any benefit in the form of preventing erosion of property values was at least once removed from the results of the litigation in that [the trial court's ruling] by no means guaranteed" changes to the Project. (*Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 230.) "Also, the amount of any monetary advantage was speculative." (*Ibid*.) "On these facts, [the Trust's] argument of financial motivation disintegrates into a claim that property owners are cut off from the benefits of section 1021.5 whenever they pursue litigation that might someday help them further or secure their property interests. The claim is untenable." (*Id.* at pp. 230-231.) Because "[a]ny potential financial incentive for [the Association] and its members is indirect and largely speculative," the trial court did not abuse its discretion in concluding the financial burden criterion was satisfied. (*Plumbers & Steamfitters*, *Local 290 v. Duncan* (2007) 157 Cal.App.4th 1083, 1099; see also *Galante Vineyards v. Monterey Peninsula Water*

---

[14] Specifically, the Trust's counsel "assume[d]" that 25 homes would be impacted and guessed that each home's value would be reduced by $20,000, saying "what's a considerable reduction in property value? [¶] No one ever quantifies it. Is it [$]50,000 on a $900,000 home? We don't know. But let's just say, to be conservative, it's only [$]20,000."

*Management Dist.* (1997) 60 Cal.App.4th 1109, 1127 [lack of "direct pecuniary benefit to petitioners in the judgment"]; *id.* at pp. 1127-1128 [and fact that "any future money advantage for petitioners is speculative . . . tend to favor a grant of attorney's fees"].)

        *3.*    *Multiplier*

The Association requested a total lodestar figure of $176,184.50, plus a multiplier of 1.75 for the contingency nature of the case for a total request of $308,322.87. The trial court awarded a reduced lodestar of $145,774, and no multiplier. In its order, the court stated "[n]o multiplier is justified here where Petitioner's counsel took the case only on a partial contingent basis. The billing rate of Petitioner's counsel already reflects the specialized nature of CEQA litigation and the full risk of contingency representation was never present." In its cross-appeal, the Association contends the trial court's ruling was based on an error of law--namely, the incorrect premise that a multiplier cannot be used in a partial contingency case. The Trust responds that the trial court understood and exercised its discretion to deny a multiplier based on the facts.

In our view, the trial court's statement is ambiguous. "The most fundamental rule of appellate review is that a judgment is presumed correct, all intendments and presumptions are indulged in its favor, and ambiguities are resolved in favor of affirmance." (*City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286.) "It is a basic presumption indulged in by reviewing courts that the trial court is presumed to have known and applied the correct statutory and case law in the exercise of its official duties." (*People v. Mack* (1986) 178 Cal.App.3d 1026, 1032.) Accordingly, we must presume the trial court understood and applied the law concerning the use of a multiplier.

Given that presumption, the question on appeal is whether the trial court abused its discretion by denying a multiplier given the Association's attorneys assumed a contingent risk of partial nonpayment. A "trial court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk . . . ." (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1138.) The trial judge is in the best position to evaluate the professional services

30

rendered at trial and the amount of attorney fees to award is a matter within its sound discretion.  (*PLCM Group*, *Inc*. *v*. *Drexler* (2000) 22 Cal.4th 1084, 1095.)  Nothing in the record convinces us the trial court's decision to deny a multiplier was " 'clearly wrong.' " (*Ibid*.)  Accordingly, we find no abuse of discretion.

## III.    DISPOSITION

The judgment is affirmed.  Respondent Keep Our Mountains Quiet is awarded costs on the Candice Clark Wozniak Trust appeal.

The Candice Clark Wozniak Trust is awarded costs on Keep Our Mountains Quiet cross-appeal.

_____
　　　　　　　　　　　　　　　Premo, J.

WE CONCUR:


_____
Rushing, P.J.


_____
Elia, J.


Keep Our Mountains Quiet v. County of Santa Clara
H039707

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 112CV221481 |
| Trial Judge: | Hon. Joseph H. Huber |
| Counsel for Plaintiff/Appellant:<br>Keep Our Mountains Quiet | Wittwer Parkin<br>William P. Parkin<br>Jonathan Wittwer |
| Counsel for Respondent:<br>County of Santa Clara | No appearance for Respondent |
| Counsel for Real Party in<br>Interest/Appellant:<br>Candice Clark Wozniak Trust | Remy Moose Manley<br>James G. Moose<br>Sabrina V. Teller<br>Jennifer S. Holman<br><br>Matteoni, O'Laughlin & Hechtman<br>Barton G. Hechtman |
| Counsel for Amicus Curiae:<br>League of California Cities<br>California State Association of<br>Counties | The Sohagi Law Group<br>Margaret M. Sohagi<br>Philip A. Seymour<br>R. Tyson Sohagi |

Keep Our Mountains Quiet v. County of Santa Clara
H039707