Filed 2/2/24; Certified for Publication 2/26/24 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MARY ANN JONES,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>SOLGEN CONSTRUCTION, LLC et al.,<br><br>　　Defendants and Appellants. | F085918<br><br>(Fresno Super. Ct.<br>No. 22CECG01590)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi C. Kapetan, Judge.

Best Best & Krieger, Damian Moos, and Adriana Castro for Defendant and Appellant, Solgen Construction, LLC.

Boutin Jones, Michael E. Chase, and Ian K. McGlone, for Defendant and Appellant, GoodLeap, LLC.

Kemnitzer, Barron & Krieg, Kristin Kemnitzer, Adam McNeile, and Malachi J. Haswell; Housing and Economic Rights Advocates and Natasha Blazer for Plaintiff and Respondent.

-ooOoo-

This case arises out of a business relationship between respondent Maryann Jones and appellants Solgen Construction, LLC ("Solgen") and GoodLeap, LLC ("GoodLeap") (or collectively "appellants") involving the installation of home solar panels. The trial court denied Solgen's and GoodLeap's separate motions to compel arbitration. Appellants appeal the denial and contend that the trial court erred by: (1) concluding that no valid agreement to arbitrate existed or that appellants failed to meet their burden of demonstrating the existence of a valid arbitration agreement; (2) imposing improper burdens on appellants with respect to demonstrating the existence of an agreement to arbitrate; (3) failing to consider evidence that was properly presented as part of a reply; (4) improperly considering hearsay evidence; (5) failing to hold an evidentiary hearing; and (6) holding that Solgen's contract was unenforceable as unconscionable. We affirm.

## PROCEDURAL BACKGROUND

On May 19, 2022, Jones filed a lawsuit in the Fresno County Superior Court against appellants. Jones alleged claims for fraudulent misrepresentation, fraudulent concealment, negligence, the Consumer Legal Remedies Act (Civ. Code, § 1750 et seq.), the Rosenthal Fair Debt Collection Practices Act (Civ. Code, § 1788 et. seq.), elder abuse (Welf. & Inst. Code, § 15610.07 et seq.), the Home Solicitations Sales Act (Civ. Code, § 1689.5 et seq.), Business and Professions Code section 7150 et seq. regarding home improvement contracts, and unfair competition (Bus. & Profs. Code, § 17200 et seq.).

On September 6, 2022, and October 21, 2022, appellants separately moved to compel arbitration.

Oral argument on the motions to compel was held on February 28, 2023, and the trial court issued its final ruling on March 2, 2023. The court adopted a prior tentative ruling without changes. In relevant part, the court held that appellants had failed to meet their burden to show that an arbitration agreement with Jones existed.

On March 10 and March 16, 2023, appellants appealed.

2.

# FACTUAL BACKGROUND

Solgen is in the business of selling and installing home solar energy systems. Solgen employs sales agents to go door to door and attempt to make sales of home solar energy systems. GoodLeap works with Solgen to provide loans for Solgen's customers. Solgen's sales representatives help customers obtain loans from GoodLeap.

In March 2022, Andre Ware was a Solgen salesman who visited Jones several times regarding home solar. At the times Ware met with Jones, she was 81 years old and lived on Social Security payments of less than $1,000 per month. As a result of Ware's interactions with Jones, a contract for the installation of a home solar energy system with Solgen and a 25-year loan contract for $52,564.28 with GoodLeap were created. Both contracts bear what purports to be Jones's electronic signature and contain arbitration clauses. The parties vigorously dispute the facts that led to the creation of these two electronically signed contracts.

### *Jones's Version of Events*

According to Jones's declaration, Ware arrived at her house and said that he was offering a free government program that would help low-income consumers get solar energy. Ware stated that the program was affiliated with PG&E. Ware came to Jones's home three times and each time explained that he was offering a government program. Jones asked Ware many times if she would have to pay anything for the program he was offering. Ware would reply that Jones would not pay anything and that the program was meant to lower Jones's PG&E bill to about $170 per month. Ware explained that just a few solar panels would need to be installed on the roof, but Jones would not have to pay for the panels.

On Ware's third visit, Ware kept turning his cell phone and electronic tablet on and off. Ware asked for Jones's Social Security number, identification, monthly income, and e-mail address. Jones does not know her e-mail address or how to access e-mail on her cell phone. Ware asked to see Jones's cell phone to try and find her e-mail address.

3.

Eventually, Ware asked Jones to put her finger on his electronic tablet. Ware did not say that Jones would be signing any documents, and Jones did not know that she was signing any. Ware did not explain to Jones that she would be signing a contract, entering a loan for solar panels separate from the PG&E program for low-income consumers, or financing solar panels separately from the PG&E program. After Ware had pressed Jones's finger to the electronic tablet, Ware left and gave Jones no paperwork. Jones could not have afforded solar panels if she had been told that she would have to get a loan to pay for them.

A few days after Ware left, workers came to Jones's home and installed solar panels. Jones also started receiving calls from GoodLeap even though she had never heard of GoodLeap. When Jones returned the calls, GoodLeap informed her that she had signed and was responsible for a 25-year loan. Jones was shocked and panicked, in part because she would be 106 years old before the loan would be paid off. Jones stated that she believed that Ware was offering a government program. GoodLeap said that they would investigate the matter.

On March 31, 2022, GoodLeap called Jones. Jones again explained that she did not sign up for a loan with GoodLeap, but instead believed that she was being offered a government program to lower her utility bill. Jones asked her grandson to help her check her e-mail because she does not know how to do so on her own. Jones's grandson found e-mails from GoodLeap, but he was unable to open the expired links. Jones did not know any e-mails from GoodLeap were in her e-mail's inbox, was not informed that e-mails would be coming, and would not have known what to do even if she had been informed that e-mails were coming. Jones never would have signed anything or signed a contract with GoodLeap because she never agreed to a GoodLeap loan.

4.

In April 2022, Solgen e-mailed Jones a copy of the contract at her request. The contract stated that the total cost of the solar system was $52,564.28. The contract indicated it was electronically signed by Jones, but Jones never saw or signed the contract, and none of the contract's terms were ever explained to her. The contract indicates that "Joshua Burns" was signor and sales agent for Solgen, even though Jones had never heard of Burns. The contract also had a DocuSign[1] page that listed Jones's e-mail address as "yoursolarguyjosh@.…" Because that was not Jones's e-mail address, she had not received a copy of the contract earlier.

***Appellants' Version of Events***

According to two declarations by Ware, he met Jones at her home in March 2022, and explained some of the benefits of installing solar panels. Jones expressed an interest in going solar, so Ware returned the next day.

When Ware returned, he explained in detail the solar programs in the state, how the programs work, and how Jones could qualify for solar installation. Ware never stated that Jones would be getting solar panels for free or as part of a government program. Ware explained that the solar panels would be financed pursuant to a loan. Ware contacted GoodLeap, and GoodLeap e-mailed a loan agreement to Jones at Jones's personal e-mail address. The loan agreement was to be executed via DocuSign. Jones opened the GoodLeap loan agreement on her mobile phone. Ware went over the loan agreement with Jones and explained the terms of the loan, including the loan's length, interest rate, monthly payments, and total cost. Ware also explained that Jones would receive a tax credit for the solar panels and that if she applied that credit, her monthly payments would remain the same and not increase after 18 months. Ware also informed Jones that the monthly payments would be automatically debited (auto debit) from her bank account, and Jones indicated she did not want that.

---

[1] "DocuSign" is a service that permits individuals to securely and electronically generate, send, sign, and retain documents.

Ware explained that if auto debit was not used, her APR would increase by 0.50 percent and that her monthly payment would increase by about $10 to $177 per month. Jones said that was acceptable. Ware then unsuccessfully attempted to opt Jones out of auto debit. Ware and Jones stopped executing the loan agreement, and Ware called GoodLeap. Ware identified himself as "Joshua Burns," Ware's supervisor. After Ware explained the purpose of the call to GoodLeap, he handed the phone to Jones. Jones spoke to GoodLeap and opted out of auto debit. After Jones opted out of auto debit, GoodLeap sent a new loan agreement to Jones's e-mail. Jones opened the second loan agreement on her cell phone and then executed the loan agreement via DocuSign. After Jones electronically signed the second loan agreement, a fully executed copy of the agreement was e-mailed to Jones at her personal e-mail. Ware spent approximately one hour with Jones going over the terms of the loan.

With respect to the installation contract with Solgen, Ware had a practice of mailing such contracts to a Solgen e-mail address instead of the customer's address out of concerns for privacy and identity theft. Ware explained this procedure, and Jones acquiesced. Ware had the installation contract sent to "yoursolarguyjosh@...", a Solgen e-mail address. The e-mail contained a DocuSign link so that Jones could electronically sign the installation contract. When the installation contract arrived at the Solgen e-mail address, Ware opened the e-mail on his tablet, gave the tablet to Jones, and asked Jones if she had any questions. Jones said that she did not and then she quickly clicked through the signatures on DocuSign on Ware's tablet. Ware did not misrepresent the content of the installation contract, did not pressure Jones, and did not sign for Jones. After Jones electronically signed the installation contract, Ware recorded a video of Jones regarding the transactions.

### March 17, 2022 Call to GoodLeap

There is an audio recording of the call that Ware made to opt Jones out of auto debit. The recording reflects that Ware identified himself as Joshua Burns. The recording indicates that GoodLeap representative "Linda" said that she was on a recorded line "for GoodLeap." The recording includes Linda telling Jones that the APR would rise from 1.99 percent to 2.49 percent without the auto debit and that the payment would rise from about $167 to $177. Jones responded, "So I would have to pay a little bit more?" Linda responded affirmatively, and Jones said that would be fine. There were often noticeable pauses between Linda's questions and Jones's responses.

### Video of Jones

Ware recorded a one-minute and 25-second video of Jones. In the video, Jones provided general information, as well as her e-mail address. While giving her e-mail address, it appeared as though Jones was reading, she paused while reading, incorrectly added a zero to her e-mail address, and then ended the e-mail address by saying "com" instead of "dot com." Ware asked Jones if she understood that "this is a 25-year agreement," that her "interest is at 2.99%," that she "will pay $177 for the first 18 months," that she "will pay $177 after 18 months if [she] applie[s] the tax credit," that her "system size is 9.5 kilowatts," and that her "total payout after 25 years is fifty-two thousand." Jones responded "yes" to each question. After she answered the "payout" question, Jones looked at Ware and furrowed her brow. Ware then asked how Jones's experience was, and Jones responded, "very good."

### March 30, 2022 Call to GoodLeap[2]

On March 30, 2022, Jones returned calls from GoodLeap. A recording of Jones's call, in relevant part, reflects that Jones spoke with "Bethany" and told Bethany that she called GoodLeap because it had been calling her to "explain my loan." After Bethany

---

[2] This call lasted about 14 minutes. In the interest of brevity, we summarize the relevant aspects of the call.

7.

asked if Jones understood that the loan had a 25-year term, Jones responded that she did "not understand [Bethany] calling it a loan" because Jones believed she was participating in a government program. Bethany stated that this was incorrect, and that Jones would be paying $177.34 per month on the loan. Jones replied that she believed that her PG&E bill would be $177 per month. Bethany stated that she needed to file a report and that GoodLeap would need to investigate. When Bethany told Jones that the loan was for $52,564.28, Jones responded quickly and in a surprised voice. When asked if Jones remembered signing anything, she said she remembered signing "something" but that she could not read what she was signing because it was on a small phone. Jones again confirmed she believed she was in a government incentive that would lock in her PG&E payment for $177. Jones also stated that no one told her she was getting a loan or would have an interest rate and she could not afford another payment.

### March 31, 2022 Call to Jones[3]

On March 31, 2022, Jones received a follow up call from GoodLeap and spoke to "Gabby." A recording of the call, in relevant part, reflects that Gabby understood that Jones had "hesitations" about the loan agreement. Jones replied that she had "all kinds of hesitations," and she did not understand who the company was, what the name of the company was, and that she was over 80-years old and would not be taking out any loans when she only receives small Social Security checks. Gabby stated that Jones selected financing to pay for the panels, and Jones interrupted that she did not select financing. Jones said that the salesman informed her that she would be participating in a government program. Gabby asked if Jones remembered taking a video with the salesman, and Jones said that she did not take a video. Gabby then stated that she had the video and began describing the video's contents. Gabby said that the salesman said the interest rate was 1.99 percent, but Jones said that the salesman said that the rate was 2.9 percent because

---

[3] This call lasted about 12 minutes. In the interest of brevity, we summarize the relevant aspects of the call.

there was no auto debit. Gabby also discussed that Jones's monthly payment would rise to $241 after 18 months if the tax credit was not used. Jones expressed her surprise about this information and stated that she had never heard that before. Jones stated that the salesman said that he was offering a government program, he pulled up her e-mail address on her phone because she did not know how to do that, and she did not agree to a loan.

### April 18, 2022 Call to Solgen

On April 18, 2022, Jones called Solgen. A recording of the call reflects that Jones said she wanted to get a copy of the "contract that I signed with your company." The Solgen representative e-mailed a copy of the installation contract to Jones's e-mail. When asked if she had received the contract, Jones asked the Solgen employee to wait. Jones then asked her daughter for help accessing e-mail on her cell phone so that she could see if the contract had arrived. Jones and her daughter can be heard trying to figure out how to access Jones's e-mail on Jones's cell phone. Jones's daughter can be heard asking Jones how to check e-mail from Jones's phone, and Jones responded that she did not know how. After about three minutes, Jones's daughter figured out how to access the e-mail and confirmed that the document had been received.

## DISCUSSION

### I. Hearsay Evidence

#### A. *Parties' Arguments*

Solgen argues that the trial court erroneously relied on inadmissible hearsay from a DocuSign document when it denied the motions to compel. Because no evidence was proffered regarding the preparation of the DocuSign document or the accuracy and reliability of the document, the document does not meet the hearsay exception of Rule of Evidence 1271. Jones does not specifically address this objection. We disagree with Solgen that the trial court erred.

9.

**B.** *Additional Background*

In denying the motions to compel, the trial court found, among other things, that Jones reviewed and signed GoodLeap's 21-page loan agreement in 38 seconds. The 38-second figure was derived from DocuSign documents submitted by GoodLeap. Specifically, a DocuSign certificate shows that the loan agreement was viewed at 3:48:36 p.m. and fully executed at 3:49:14 p.m. Solgen objected at the hearing that this 38-seconds figure was not sufficiently authenticated, accurate, or exempted from the hearsay rule. The court did not expressly rule on or address Solgen's hearsay objection.

**C.** *Legal Standard*

A trial court's evidentiary ruling is reviewed for abuse of discretion. (*People v. Flores* (2020) 9 Cal.5th 371, 409; *Geragos v. Abelyan* (2023) 88 Cal.App.5th 1005, 1021.) A trial court abuses its discretion if its ruling exceeds " ' "the bounds of reason, all of the circumstances before it being considered." ' " (*Daniel v. Wayans* (2017) 8 Cal.App.5th 367, 393–394; *Maughan v. Google Technology, Inc.* (2006) 143 Cal.App.4th 1242, 1249.) " ' "A decision will not be reversed merely because reasonable people might disagree." ' " (*Maughan*, at p. 1249.)

Evidence Code section 1271 excepts from the hearsay rule certain business records. (Evid. Code, § 1271 ("section 1271"); see *People v. Hovarter* (2008) 44 Cal.4th 983, 1010–1011 (*Hovarter*); *Conservatorship of S.A.* (2018) 25 Cal.App.5th 438, 447 (*S.A.*).) To meet the business records exception, the proponent of the evidence must establish that: (1) the writing was made in the regular course of business; (2) the writing was made at or near the time of the act, condition, or event; (3) the custodian or other qualified witness testifies to its identity and the mode of its preparation; and (4) the sources of information and mode and method and time of preparation indicate trustworthiness. (Evid. Code, § 1271; *Hovarter*, at pp. 1010–1011; *S.A.*, at p. 447.) The trial court has broad discretion in determining whether the proponent has laid the appropriate foundation under section 1271. (*Hovarter*, at pp. 1010–1011; *S.A.*, at p. 447.)

**D.** *Analysis*

The issue is whether the viewing-time and signing-time information contained in the DocuSign certificate meets the business record hearsay exception of section 1271. Viewing this issue through the prism of the deferential abuse of discretion standard, we detect no error by the trial court.

In support of its motion to compel arbitration, GoodLeap submitted the declaration of its chief revenue officer and custodian of records, Matt Dawson. The information in Dawson's declaration meets each of the four foundational requirements of section 1271. Dawson's declaration shows that GoodLeap regularly creates and maintains loan agreements. According to Dawson, loans are signed at the time borrowers consummate the loan, and GoodLeap's loan agreements are executed by borrowers using DocuSign, and DocuSign complies with 15 U.S.C. section 7001.[4] Dawson explains that it is GoodLeap's practice to use DocuSign because it is best-in-class, cloud based, encrypted, and provides a secure digital audit trail. For each loan agreement, DocuSign assigns a secure and unique envelope-code, sends the loan agreement to the borrower at the borrower's e-mail address, and generates an encrypted certificate of completion, which includes the date and time the agreement was viewed and signed by the borrower, once the borrower signs the loan agreement. The certificate is sent to the borrowers and GoodLeap, and GoodLeap retains the certificates.

In a nutshell, GoodLeap routinely utilizes DocuSign to enter into and store loan agreements, and the DocuSign program securely sends documents to a borrower's e-mail address, creates a reliable electronic audit trail that tracks and records the times in which documents are viewed and signed, and sends a certificate of completion that includes viewing and signing times to both the borrower and GoodLeap shortly after signing.

---

[4] 15 U.S.C. section 7001 is part of the Electronic Signatures in Global and National Commerce Act (*Campbell v. General Dynamics Government Systems Corp.* (1st Cir. 2005) 407 F.3d 546, 556), sometimes referred to as the "E-Sign Act." (*Lavallee v. Med-1 Sols., LLC* (7th Cir. 2019) 932 F.3d 1049, 1056.)

11.

GoodLeap's regular use of, and dependency on, DocuSign, and Dawson's description of what DocuSign does for each GoodLeap contract, is sufficient to show the DocuSign document is trustworthy. Considering the wide discretion possessed by the trial court, Dawson's declaration meets the requirements of section 1271. (Evid. Code, § 1271; *Hovarter*, *supra*, 44 Cal.4th at pp. 1010–1011; *S.A.*, *supra*, 25 Cal.App.5th at p. 447.) Therefore, the trial court did not act " ' "beyond the bounds of reason" ' " (*Daniel v. Wayans*, *supra*, 8 Cal.App.5th at pp. 393–394), and thus did not abuse its discretion with the respect to the 38-second figure derived from the DocuSign certificate.

## II.     Consideration of Reply Evidence

### A.     *Parties' Arguments*

Solgen argues that the trial court erroneously failed to consider the April 2022 recording. Solgen avers the recording was properly submitted in reply, as opposed to its motion, because the recording responds to arguments made in Jones's opposition. Jones argues in part that Solgen has not shown error because there is no evidence that the trial court failed to consider the recording. We agree with Jones.

### B.     *Additional Background*

During the hearing on the motions to compel arbitration, the trial court and Solgen's counsel discussed the April 2022 recording being submitted as part of the reply:

> "Solgen:     No, your Honor. Because it was filed in reply to the evidence or the argument that was provided by the opposing party.
>
> "THE COURT:     But it was new evidence – it is new evidence that you submitted on reply.
>
> "[SOLGEN:]     It is new evidence we submitted on reply in response to the opposition.
>
> "THE COURT:     Okay. Well, I know it's in response. It's a reply. I do understand that.
>
> "[SOLGEN:]     … But again, the evidence was submitted in response to specific evidence provided by the other side. And in that

12.

respect, I don't believe it's improper for the Court to consider it, especially when it's an admission from the party claiming she never signed the agreement to have a recording of her say, "I want the agreement that I signed."

"THE COURT:     Okay.

"[SOLGEN:]     Turning to the issue – I'm sorry, what was that, your Honor?

"THE COURT:     I understand what you are talking about.  So now you're going to argue from that declaration, or what?"

## C.    *Legal Standard*

"An order is presumed correct; all intendments are indulged in to support it on matters as to which the record is silent, and error must be affirmatively shown." (*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 321; see *Wolstoncroft v. County of Yolo* (2021) 68 Cal.App.5th 327, 347.)  Thus, " '[i]n the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court.' " (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609.)  This includes resolving any ambiguities in favor of affirmance.  (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1069 (*Eli B.*); *Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 740–741 (*Keep Our Mountains Quiet*).)  "Only '[w]hen the record clearly demonstrates what the trial court did' will the reviewing court 'not presume it did something different.' " (*Eli B.*, at p. 1069; see also *People v. Rogers* (2006) 39 Cal.4th 826, 910.)

## D.    *Analysis*

Solgen's argument relies on the trial court's statements during the motions to compel hearing and the court's failure to mention the April 2022 recording in the order denying arbitration.  Solgen's argument is infirm.

First, the trial court never held that the reply recording was inadmissible or would not be considered.  To the contrary, the court asked about the submission of the recoding being part of the reply, as opposed to being part of the moving papers.  After discussion,

13.

the court indicated it understood that the recording was submitted in response to Jones's opposition and inquired as to how Solgen intended to rely on the recording. This exchange can easily be read as the court both seeking to understand why Solgen submitted the recording as part of the reply and then, after explanation from Solgen, considering Solgen's arguments that were based on the recording. At best, the exchange is ambiguous. However, since ambiguities are resolved in favor of affirmance, we construe the exchange as showing that the court considered and did not exclude the April 2022 recording. (*Eli B.*, *supra*, 73 Cal.App.5th at p. 1069; *Keep Our Mountains Quiet*, *supra*, 236 Cal.App.4th at pp. 740–741.)

Second, the order's silence regarding the recording does not help Solgen. Trial courts are "not required to mention every arguably pertinent item of evidence before it, let alone explain in minute detail its view of each item." (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 565.) Moreover, the appellate presumptions are in favor of the trial court's actions if there is a silent record. (*Jameson v. Desta*, *supra*, 5 Cal.5th at p. 608; *Corenevsky v. Superior Court*, *supra*, 36 Cal.3d at p. 321.) Solgen has not rebutted those presumptions. Therefore, we presume that the trial court considered Solgen's reply recording.

In sum, the record does not show that the April 2022 recording was excluded.

## III.   Denial of Arbitration

### A.   *Parties' Arguments*

#### 1.   GoodLeap

GoodLeap argues that the evidence established that Jones signed the loan contract. The DocuSign certificate shows Jones electronically signed the loan and received a copy of the signed loan at her personal e-mail, both on March 17, 2022. The loan contract contains a broad arbitration clause that covers all claims alleged by Jones. Considering her representations on the video and the recording of her successfully opting out of auto

14.

debits, Jones did not sufficiently establish fraud. Therefore, the trial court's decision is not supported by substantial evidence.

### 2. Solgen

Solgen argues that, through a de novo review of the issue, the declaration of Ware and the video and audio recordings of Jones established that the parties entered into an agreement to arbitrate. Solgen also argues that the trial court misinterpreted *Ruiz v. Moss Bros. Auto Group, Inc.* (2014) 232 Cal.App.4th 836, to impose a higher standard of proof regarding electronic signatures and also improperly imposed a requirement for Ware to point out the arbitration provision, which is contrary to law.

### 3. Jones

With respect to GoodLeap, Jones argues that the trial court correctly concluded that GoodLeap failed to establish both the existence of an arbitration agreement and that Jones electronically signed the loan agreement. In addition to the express findings of the court, other evidence presented to the court, such as Jones's low monthly income, her inability to access e-mail on her cell phone without help, the omission of key facts or terms in the video taken by Ware, Jones's shock and surprise during conversations with GoodLeap, and Ware having access to Jones's cell phone, all support the contention that Jones did not sign the loan contract.

With respect to Solgen, Jones argues that the trial court's decision in denying the motion to compel is reviewed, not the reasoning behind that decision, and that the review is for clear error, not de novo. The court's conclusion that Solgen did not prove the existence of an arbitration agreement was not erroneous as a matter of law. Facts such as Ware intentionally sending the contract to a Solgen e-mail, DocuSign documents showing that the contract was signed in 27 seconds, and Solgen failing to send the contract (either physically or electronically) to Jones at the time of signing all support the conclusion that Solgen did not meet its burden. Additionally, Jones argues that the court

15.

did not err by relying on *Ruiz v. Moss Bros. Group*, *supra*, 232 Cal.App.4th 836, and the court's reference to Jones's awareness of the arbitration agreement was immaterial.

We agree with Jones that the trial court's order is adequately supported.

**B.**     ***Additional Background***

On March 3, 2023, the trial court formally adopted its tentative ruling and denied appellants' separate motions to compel.  Under the "Agreement to Arbitrate" section of the order, the court described the applicable law and some aspects of the parties' submitted evidence.  In relevant part, the court wrote:

> "According to Ware, plaintiff indicated she did not want her payments auto debited, so execution of the loan documents was paused to allow Ware to contact GoodLeap by telephone.  During the telephone call, Ware admits he impersonated his supervisor to confirm that auto debit would not be applied to plaintiff's agreement.  A second set of loan documents were emailed to plaintiff.  Ware also explains his practice – purportedly due to privacy concerns – of emailing 'Solgen installation documents to a company email address instead of the customer's email address.'  When he received the link on his tablet, he handed the tablet to plaintiff, who he witnessed 'quickly click[] through the signatures on DocuSign.'  After the documents were signed, Ware 'recorded a video of plaintiff acknowledging her understanding of the material terms of the loan and the documents she signed.'

> "Plaintiff contends her signature on the purported arbitration was 'forged,' and therefore invalid and unenforceable.  Plaintiff claims that, despite her 'virtually non-existent technology skills,' Mr. Ware … asked plaintiff to 'touch his tablet, but never said that she was signing a contract or requesting a loan.'  Plaintiff also notes that DocuSign certificate presented by GoodLeap shows that the entire DocuSign procedure transpired over the course of [38 seconds].  Plaintiff contends that she could not have intelligently considered the 21-page Loan Agreement and executed the thirteen signature lines within such a limited time.

> "Although plaintiff challenges the general validity and enforceability of the loan agreement on various theories, on the specific subject of these motions – plaintiff's acceptance of the arbitration agreement – neither Ware's declaration nor the video address arbitration or whether that section of the agreement was brought to plaintiff's attention during her 38 second review of the 21-page loan agreement.  Furthermore, Ware's admitted

16.

impersonation of a supervisor and practice of sending the loan agreement to a company email address instead of the customer's, tends to detract from the uniqueness and autonomy typically sufficient to authenticate an electronically signed arbitration agreement.

"Consequently, defendant's evidence is insufficient to meet its burden of showing by a preponderance of the evidence that the signature on the agreement is plaintiff's. (Citations omitted.)

"Therefore, defendants have not shown an agreement to arbitrate." (Citations omitted.)

Under a section entitled "Procedural Unconscionability," the court made the following relevant findings:

"Plaintiff's age, income, and unfamiliarity with technology is not disputed by any defendant. Nevertheless, defendants' own evidence asserted in support of their motions indicate that the solar installation agreement involved multiple sets of loan documents, numerous information materials, and a compelling total of $52,564. The alleged transaction was also the product of repeated solicitations at plaintiff's residence. Furthermore, the installation documents do not explain arbitration or its consequences.

"As discussed above, both defendants premise their motions on Ware's video recording and the security measures attendant to the DocuSign process. However, Ware does not identify himself in the video, there is no date and time indicated, and there are no other details from which it can be inferred where in the transaction the video occurred. Additionally, the video does not mention arbitration and there is conflicting evidence whether the loan agreement(s) were actually provided autonomously to plaintiff.

"The existence of the arbitration agreement inconspicuously contained within a multitude of other documents, presented electronically to an elder adult with undisputed unfamiliarity with technology, demonstrates unequal negotiating power and an absence of a meaningful opportunity to review the arbitration terms. In addition, the uncertain context of the video and Ware's impersonation of his supervisor to implement material modifications of the loan terms, tends to demonstrate noncompliance with procedural safeguards." (Citations omitted.)

17.

## C.    *Legal Standard*

Arbitration is a favored procedure under both Federal and California law. (*Marmet Health Care Center, Inc. v. Brown* (2012) 565 U.S. 530, 533; *OTO, L.L.C. v. Kho* (2019) 8 Cal.5th 111, 125.)  However, before a court may order the parties to arbitration, the court must determine the threshold question of whether a valid agreement to arbitrate exists.  (*Casa Del Caffe Vergnano S.P.A. v. Italflavors San Diego, LLC* (9th Cir. 2016) 816 F.3d 1208, 1211; *Avila v. Southern California Specialty Care, Inc.* (2018) 20 Cal.App.5th 835, 843–844 (*Avila*).)  The party seeking to compel arbitration bears the burden of establishing a valid agreement to arbitrate by a preponderance of the evidence, while the party opposing arbitration bears the burden of establishing any necessary facts in defense by a preponderance of the evidence.  (See *Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972; *Rosenthal v. Great Western Fin. Securities Corp.* (1996) 14 Cal.4th 394, 414 (*Rosenthal*); *Iyere v. Wise Auto Group* (2023) 87 Cal.App.5th 747, 755; *Trinity v. Life Ins. Co. of N. Am.* (2022) 78 Cal.App.5th 1111, 1120.)

When a trial court's order denying arbitration is based on the finding that the appellant failed to carry its burden of proof, the question on appeal is whether that finding is erroneous as a matter of law.  (*Evenskaas v. California Transit, Inc.* (2022) 81 Cal.App.5th 285, 292; *Trinity v. Life Ins. Co. of North America*, *supra*, 78 Cal.App.5th at p. 1121; *Fabian v. Renovate America, Inc.* (2019) 42 Cal.App.5th 1062, 1066.) " 'Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Juen v. Alain Pinel Realtors, Inc.* (2019) 32 Cal.App.5th 972, 978–979; see *Evenskaas*, at p. 292; *Trinity*, at p. 1121.)  In other words, the appellant must show that his evidence compelled a finding that he met his burden of proof as a matter of law.  (See *Ajaxo, Inc. v. E\*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 163–164; *Fabian*, at p. 1070; *Juen*, at pp. 978–979.)  Unless the trial court makes specific findings of fact in favor of

18.

the losing party, reviewing courts presume that the trial court found the losing party's evidence lacked sufficient weight and credibility to carry the burden of proof. (*Fabian*, at p. 1067; *Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.) The reviewing court must not judge the credibility of witnesses or reweigh the evidence, must view all factual matters most favorably to the reviewing party, and must resolve all conflicts in favor of the prevailing party. (*Fabian*, at p. 1067; see *Dreyer's Grand Ice Cream, Inc. v. County of Kern* (2013) 218 Cal.App.4th 828, 838.) "[T]he trial court's judgment is presumed correct … , with 'all intendements and presumptions in favor of its correctness.' " (*Ajaxo*, at p. 164.)

### D. *Analysis*

#### 1. Standard of Review

GoodLeap contends that the appropriate standard of review is one of substantial evidence. When a motion to compel arbitration is based on a decision of fact, the review is one of substantial evidence. (*Fabian v. Renovate America, Inc.*, *supra*, 42 Cal.App.5th at p. 1066.) However, when the decision is based on a failure of a party to meet its burden of proof, it is "misleading" to say that the review is for substantial evidence. (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465; see also *Fabian*, at p. 1066.) Instead, the standard of review is the erroneous as a matter of law standard. (*Fabian*, at pp. 1066–1067.) Here, the trial court expressly held that appellants failed to meet their burden by a preponderance of the evidence. Therefore, the appropriate standard of review is the erroneous as a matter of law standard. (*Ibid*.)

Solgen contends that the appropriate standard of review is de novo. Solgen cites four appellate court decisions that have held, if the "conflicting evidence is entirely written, a reviewing court is not bound by the finding of the trial court, but instead subjects the contract to independent review." Despite the holdings of these cases, we conclude that the appropriate standard remains the standard we set forth above.

19.

Solgen cites *Patterson v. ITT Consumer Financial Corp.* (1993) 14 Cal.App.4th 1659, 1663, and three other cases that cite to and depend on *Patterson*.[5] *Patterson* relied solely on *Milazo v. Gulf Ins. Co.* (1990) 224 Cal.App.3d 1528, 1534, and *Milazo*, in turn, relied on *Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 529 and *Estate of Shannon* (1965) 231 Cal.App.2d 886, 890–891. Ultimately, it is *Coopers & Lybrand* and *Estate of Shannon* that are the source of the "*Patterson/Milazo* rule" that a reviewing court conducts a de novo review of a trial court's order/findings that are based solely on written evidence. However, *Coopers & Lybrand* did not hold that a reviewing court may disregard the findings and determinations of a trial court when those findings and determinations are based only on written evidence. (*Coopers & Lybrand*, at p. 529.) Rather, *Coopers & Lybrand* simply stated the rule that interpretation of a contract is a question of law "unless the interpretation turns upon the credibility of extrinsic evidence." (*Ibid.*) *Coopers & Lybrand* does not support the "*Patterson/Milazo* rule." Similarly, *Estate of Shannon* hypothesized: "But where only the interpretation of written instruments is concerned, unaffected by extrinsic evidence, is not an appellate court, after studying the briefs on appeal, listening to the arguments of counsel, and thereafter engaging in a full discussion of the problem among the justices, in a more adequately informed position than is the trial judge and therefore better able to interpret the intent of the parties?" (*Estate of Shannon*, at p. 890.) *Estate of Shannon* cited no authority in support of its point and then expressly stated that the facts of the case did *not* involve any issues about extrinsic evidence. (*Id.* at p. 891). In other words, *Estate of Shannon*'s key language is dicta. Therefore, the "*Patterson/Milazo* rule" is based on one case that does not actually support the rule and on another case whose relevant language is unsupported dicta. The "*Patterson/Milazo* rule" is simply inadequately supported.

---

[5] These three cases are: *In re Tobacco Cases I* (2004), 124 Cal.App.4th 1095, 1105; *Marcus & Millichap Real Estate Investment Brokerage Co. v. Hock Investment Co.* (1998) 68 Cal.App.4th 83, 89; and *Mayhew v. Benninghoff* (1997) 53 Cal.App.4th 1365, 1369.

Additionally, the "*Patterson/Milazo* rule" is contrary to established authority. Our Supreme Court has held that a trial court's judgment or order receives the same deference whether it is based on declarations and written evidence or based on oral testimony. (*People v. Vivar* (2021) 11 Cal.5th 510, 528, fn. 7; *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711, fn. 3; *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479 ["Even though contrary findings *could* have been made, an appellate court should defer to the factual determinations made by the trial court when the evidence is in conflict. This is true whether the trial court's ruling is based on oral testimony or declarations" (fn. omitted)]; *Griffith Co. v. San Diego College for Women* (1955) 45 Cal.2d 501, 507–508; see also *Desert Outdoor Advertising v. Superior Court* (2011) 196 Cal.App.4th 866, 868, fn. 1.) It is this authority, not *Patterson* and *Milazo*, that determines how an appellate court reviews the orders of a trial court that are based on written materials or declarations.

Finally, even if the "*Patterson/Milazo* rule" was adequately supported and not contrary to binding authority, the evidence in this case does not involve extrinsic evidence that consists solely of written evidence. The parties submitted four audio recordings and one video recording, each of which required the consideration and interpretation of the trial court. Thus, this case does not fit within the plain language of the "*Patterson/Milazo* rule."

For these reasons, we reject Solgen's arguments that the applicable standard of review in this matter is de novo.

### 2. Failure to Meet Burden of Proof

To prevail, appellants must show that the trial court's conclusion that they failed to meet their burden of proof was erroneous as a matter of law. (*Evenskaas v. California Transit, Inc.*, *supra*, 81 Cal.App.5th at p. 292; *Victaulic Co. v. American Home Assurance Co.* (2022) 80 Cal.App.5th 485, 505; *Trinity v. Life Ins. Co. of North America*, *supra*, 78 Cal.App.5th at p. 1121*; Fabian v. Renovate America, Inc.*, *supra*, 42 Cal.App.5th at p. 1067; *Juen v. Alain Pinel Realtors, Inc.*, *supra*, 32 Cal.App.5th at pp. 978–979.) Some

21.

courts maintain that if " ' "the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in [its] favor." ' " (*Fabian*, at p. 1067; see also *Victaulic*, at p. 505.) Appellants have not achieved the "almost impossible" in this case.

Appellants' evidence was not "uncontradicted and unimpeached." Jones's declaration stated that she did not sign and enter into the contracts and that she was not told she would be signing a contract or entering into a loan, that she would have to finance the purchase of the solar panels, or that she was enrolling in a nongovernment transaction. Instead, Jones declared she was told that she would be enrolling in a free government program for low-income households in conjunction with PG&E, the plan included installation of solar panels, and the result of the plan would be that she paid $177 per month for her PG&E utility bill. Jones declared that Ware never told her that she was entering into any contracts or loans. Jones also simply touched Ware's tablet at Ware's direction, and Ware manipulated Jones's cell phone in connection with Jones's e-mail. Also, Jones's almost nonexistent technological ability (as confirmed by the April 2022 call to Solgen) combined with the timing of the electronic opening, review, and signing of the contracts (less than 30-seconds for Solgen's contract and less than 40-seconds for GoodLeap's contract) is inconsistent with the propositions that Jones had an adequate opportunity and ability to review and understand the contracts at issue, that Jones knew she was signing contracts, or that Jones was the one who actually electronically signed the two contracts. Each of these points is contrary to and inconsistent with appellants' evidence and arguments, and each of these points indicates that Jones did not sign and enter into an agreement to arbitrate with either Solgen or GoodLeap.

The trial court's order shows that it found Jones's evidence more credible. The court's order specifically noted the timing of the review and signature process in relation to Jones's clear lack of technological prowess. Similarly, the court noted that Ware never e-mailed the Solgen installation contract to Jones during the signing process. Instead, the contract was sent to and signed through an e-mail address that Ware and Solgen controlled. These facts clearly call into question the nature of Jones's purported electronic signature on both contracts. The court also made note of Jones's age and income. Jones was 81, and her income consisted of small Social Security checks. Crediting Jones's assertion that she is careful with her money because of her low income, Jones's age and income make it unlikely that Jones would sign a 25-year loan for $52,000. Further, the court found significant the fact that Ware was willing to contact GoodLeap and knowingly give false information about his identity to materially alter the terms of the GoodLeap loan agreement. The court implicitly found this conduct undercut the credibility of Ware's declaration.[6]

Appellants rely heavily on the video recording and four audio recordings. However, none of the recordings are so clear and compelling that reversal of the trial court's order is mandated, particularly considering the trial court's implicit credibility determinations.

In the March 17 recording in which auto debit was declined, there are noticeable pauses in the conversation between GoodLeap and Jones. Thus, it is not clear if Jones heard everything that was said. Moreover, the clear gist of the call was that Jones did not want her bank account to be auto debited. Once she knew that this option would be

---

[6] Although not mentioned in the trial court's order, Jones has pointed out that Ware's account of the timing between the two GoodLeap loan agreements does not match GoodLeap's documentation. Ware testified that a second loan agreement was signed by Jones, but as Jones points out, GoodLeap's documentation indicates that a second loan application was denied because Jones already had an active account with GoodLeap. Appellants do not discuss this discrepancy, but the discrepancy raises further questions regarding the transactions and Ware's credibility.

removed and she would only pay a little bit extra, she was satisfied. The call does not show that Jones signed and entered into a loan agreement, rather, it shows only that Jones knew her bank account would not be auto debited, and she would pay a little extra as a result.

In the other two audio recordings between Jones and GoodLeap, Jones consistently expressed shock and surprise that she was both in a loan and the terms of the loan itself. Jones repeatedly said she was told that she would be participating in a no cost government program that would lower her utility bill to about $177 per month. Jones never agreed with GoodLeap that she had either signed a contract or agreed to a loan. The two recordings do not establish that Jones signed the GoodLeap loan agreement.

Similarly, the video recording does not state that Jones signed any contract with either Solgen or GoodLeap. The video demonstrates Jones's lack of technological ability because she was clearly reading her e-mail address, did not provide an accurate e-mail address, and did not end the address by saying the traditional "dot com." The video asks Jones about an installation and agreement but does not use the terms "loan" or "contract," nor does the video ever mention Solgen or GoodLeap. The video does not explain that Jones's payments would rise to $241 after 18 months, nor does the video ever state that Jones signed any contracts. The video does mention payments and states that over 25 years Jones would pay out $52,000, but the video does not say that this was a loan or clarify to whom the payments would be sent, i.e., to GoodLeap and not PG&E. Moreover, when the $52,000 figure was given, Jones furrowed her brow as if confused. Finally, the video does mention an inaccurate APR of 2.99 percent. While an APR figure would be indicative of a loan, it may not necessarily be inconsistent with a government program. It is unclear if Jones understood in general what an APR is, or specifically what the APR meant in relation to her transactions with Ware. Moreover, knowledge of an APR does not of itself establish that Jones signed anything. Under the totality of the

circumstances, Jones's erroneous acknowledgement of an inaccurate APR does not compel a finding that Jones validly entered into a loan agreement with GoodLeap.

Finally, Jones's April 2022 call to Solgen demonstrated that she does not know how to access e-mail on her cell phone and confirmed her virtually nonexistent technological ability. Solgen strenuously points out that Jones asked for a copy of the contract that she "signed." Solgen makes entirely too much out of an isolated sentence by a non-attorney. If Jones's goal was to get a written copy of the alleged installation contract, then her call is completely appropriate. There is nothing that required Jones to use specific words or incorporate legal caveats when she attempted to get a copy of a contract that she had previously denied signing. Although the sentence can be viewed as an admission that Jones signed a contract, it can also be viewed as Jones quickly trying to get a copy of a document that Solgen contended she signed. In the context of this appeal, and given the nature of the trial court's ruling, we are compelled to view the sentence in the latter sense. (*Fabian v. Renovate America, Inc.*, *supra*, 42 Cal.App.5th at p. 1067.)

Solgen also argues that the trial court imposed an unlawful requirement that Ware was required to highlight the arbitration clause of any contract. As quoted above, the court stated that Ware's declaration and the video did not show that the arbitration agreement was brought to Jones's attention during the 38-second review of the 21-page loan agreement. Solgen is correct that a requirement to specifically highlight an arbitration clause is preempted by the Federal Arbitration Act. (*Sanchez v. Valencia Holding Co., LLC* (2015) 61 Cal.4th 899, 914.) However, we believe it is possible to read the court's order as not imposing such a requirement. There is an implicit conclusion within the trial court's order that Jones could not have validly entered into a contract with an arbitration clause when the contract was 21 pages, the review period was 38 seconds and through a cell phone, and Jones was 81 years old with virtually no technological ability. This implicit conclusion could be undermined to some extent if appellants had submitted evidence that Jones specifically had been told about the

25.

arbitration clauses. In other words, rather than imposing a requirement that is contrary to *Sanchez*, the court's order can be read as identifying a type of evidence that could have been presented, but was not, and that could have supported the conclusion that an arbitration agreement existed. Because we resolve ambiguities in favor of the validity of a court's order, this is how we interpret the court's order. (*Eli B.*, *supra*, 73 Cal.App.5th at p. 1069; *Keep Our Mountains Quiet*, *supra*, 236 Cal.App.4th at pp. 740–741.)

Finally, Solgen argues that the trial court misread *Ruiz v. Moss Bros. Auto Group, Inc.*, *supra*, 232 Cal.App.4th 836 to impose a heightened requirement for electronic signatures. In part, the court's order states that the "defendants must produce a higher level of proof where the arbitration agreement was allegedly signed electronically." Despite the court's use of the term "higher burden," the substance of the order does not indicate that a higher burden was actually imposed. The next sentences after the "higher burden" quotation accurately discussed how the employer in *Ruiz* submitted a declaration that generally asserted that the employee signed the arbitration agreement, but that the general assertion was insufficient to authenticate the signature. (*Id*. at p. 844.) Further, at another portion of the order, the court indicated that the unique process of affixing an electronic signature to an agreement is generally considered sufficient to authenticate an electronic signature. The court then cited to *Ruiz* and held that the facts of this case undermined that usual process. The specific facts identified were that Ware impersonated his supervisor, Ware sent the installation contract only to a Solgen e-mail, and the review time for the lengthy contract was less than 40 seconds on a cell phone by an 81 year old with virtually no technological ability. We agree with the court that these facts are inconsistent with a typical electronic signing process. (Cf. *Espejo v. Southern California Permanente Medical Group* (2016) 246 Cal.App.4th 1047, 1062 [discussing the evidence that connected the electronic signature to the signor and how the evidence presented surpassed the conclusory assertions in *Ruiz*].) Considering the relevant references to *Ruiz* and the actual analysis in the court's order, we read the court's order as

26.

meaning that an employer cannot simply rely on conclusory assertions that fail to link an electronic signature with the alleged signor, and that the facts in this case undermine Ware's assertions that he saw Jones sign the contracts. We do not read the court's order as imposing a burden above and beyond what is necessary to authenticate a signature. (Cf. *Eli B.*, *supra*, 73 Cal.App.5th at p. 1069 [resolving ambiguities in a court's order in favor of affirmance]; *Keep Our Mountains Quiet*, *supra*, 236 Cal.App.4th at pp. 740–741 [same].)

In sum, the trial court did not impose improper burdens on appellants. Further, appellants' evidence was not uncontroverted and unimpeached and did not compel a finding that appellants met their burden of proof. Therefore, the trial court's conclusion that appellants failed to meet their burden of establishing a valid signature and thus, a valid agreement to arbitrate was not erroneous as a matter of law.

## IV. Evidentiary Hearing

### A. *Parties' Arguments*

GoodLeap argues that the trial court reversibly erred by not holding an evidentiary hearing because the parties' factual account of events was sharply contested. Jones argues among other things that the court did not abuse its discretion in declining to hold an evidentiary hearing. We agree with Jones.

### B. *Legal Standard*

When a petition to compel arbitration is filed, the trial court is to resolve the petition "in a summary manner and upon the notice provided by law for the making and hearing of motions …." (Code Civ. Proc., § 1290.2; *Rockefeller Technology Investments (Asia) VII v. Changzhou Sino Type Technology Co., Ltd.* (2020) 9 Cal.5th 125, 142.) This generally means that "facts are to be proven by affidavit or declaration and documentary evidence, with oral testimony taken only in the [trial] court's discretion." (*Rosenthal*, *supra*, 14 Cal.4th at pp. 413–414; *Chambers v. Crown Asset Management, LLC* (2021) 71 Cal.App.5th 583, 592.) There is no entitlement to an evidentiary hearing,

and a trial court does not per se abuse its discretion by resolving evidentiary conflicts without hearing live testimony. (*Rosenthal*, at p. 414; *Ashburn v. AIG Financial Advisors, Inc.* (2015) 234 Cal.App.4th 79, 96 (*Ashburn*).) However, when the "enforceability of an arbitration clause may depend upon which of two sharply conflicting factual accounts is to be believed, the better course would normally be for the trial court to hear oral testimony and allow the parties the opportunity for cross-examination." (*Rosenthal*, at p. 414; see *Ashburn*, at p. 96; see also *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1157 ["With respect to claims of fraud, where factual differences may be difficult to resolve without making credibility determinations, oral testimony is generally appropriate"].)

The decision of whether to hold an evidentiary hearing is reviewed for an abuse of discretion. (See *Sonic-Calabasas A*, *supra*, 57 Cal.4th at p. 1157 [recognizing that trial courts have discretion to take oral testimony]; *Engalla v. Permanente Medical Group, Inc.*, *supra*, 15 Cal.4th at p. 972 [same]; *Rosenthal*, *supra*, 14 Cal.4th at p. 414 [same]; *Ashburn*, *supra*, 234 Cal.App.4th at p. 97 [holding that the trial court abused its discretion by not conducting an evidentiary hearing].) "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason." (*Shamblin v. Brattain*, *supra*, 44 Cal.3d at p. 478; see *People v. Johnson* (2022) 12 Cal.5th 544, 605.) " 'A merely debatable ruling cannot be deemed an abuse of discretion.' " (*Johnson*, at p. 605; *Electronic Frontier Foundation, Inc. v. Superior Court* (2022) 83 Cal.App.5th 407, 422.) An abuse of discretion may be demonstrated by showing " ' " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Johnson*, at pp. 605–606; *Electronic Frontier Foundation*, at p. 422.)

C. *Analysis*

In this case, there are allegations of fraud and sharp factual disputes between the declarations of Jones and Ware. Under *Rosenthal* and *Sonic-Calabasas A*, the trial court

would have been well advised to conduct an evidentiary hearing as the "better course." Nevertheless, "better course" is not synonymous with "only reasonable course," and the fact that the "better course" was not pursued does not mean that the court abused its discretion.

In addition to the competing declarations of Jones and Ware, the trial court also had the benefit of four audio recordings and one video recording. Aspects of these recordings are clearly favorable to Jones. During the two phone calls with GoodLeap, Jones consistently sounded surprised or concerned about being responsible for a 25-year $52,000 loan and repeatedly stated that she did not sign contracts but believed that she was being enrolled in a free government program that would set her energy payments at $177 per month. Moreover, the April 2022 call with Solgen clearly demonstrated that Jones's technological prowess, at least with her cell phone, is extremely limited. The call revealed that Jones did not know how to access or retrieve e-mail messages (including attachments) from her cell phone. Jones had to get help from her daughter and can be heard telling her daughter that she (Jones) does not know how to access e-mail from her phone. Similarly, the video confirms Jones's limited ability or understanding with respect to e-mail. Jones paused, read something, did not give her correct e-mail address, and failed to say the familiar "dot com" ending while trying to tell Ware her e-mail address. Additionally, when Ware mentioned that Jones would pay about $53,000 in total, Jones furrowed her brow, which can be interpreted as a sign of confusion, and Ware quickly asked Jones about her experience, which can be interpreted as an attempt to cut off a forthcoming question or brush past an important and misunderstood (or misrepresented) point. The court clearly believed that it had sufficient information before it to resolve key disputes and rule on the motions to compel. Considering the recordings and the undisputed aspects of the declarations, we cannot say that the court's decision to not hold an evidentiary hearing was so arbitrary, capricious, or patently absurd that there

29.

was a miscarriage of justice. Therefore, the court's decision was not outside the bounds of reason and did not constitute an abuse of discretion.

GoodLeap relies heavily on *Ashburn*, which held that a trial court abused its discretion by not holding an evidentiary hearing. However, the First District Court of Appeal had two bases for reaching this conclusion. First, the record contained no indication that the lower court had exercised its discretion. (*Ashburn*, *supra*, 234 Cal.App.4th at p. 97.) In this case, GoodLeap asked for an evidentiary hearing, and none was provided. Although the court did not explain its implicit denial, we presume that the court exercised its discretion in denying the request. (*Jameson v. Desta*, *supra*, 5 Cal.5th at p. 608; *People v. Stowell* (2003) 31 Cal.4th 1107, 1114; *Corenevsky v. Superior Court*, *supra*, 36 Cal.3d at p. 321.) Second, the disputes in *Ashburn* were profound and extensive. (*Ashburn*, at pp. 98–99.) The *Ashburn* parties could not agree as to what the pertinent documents were called, what the five appellants signed, how they came to sign the documents, whether meetings with appellee's representative occurred, or what the signed documents said, and the nature of the relationship between appellee's representative and the five appellants was disputed. (*Ibid.*) In this case, there is ultimately a dispute between Jones and Ware. There are no disputes involving multiple plaintiffs, the nature of the relationship between Jones and Ware, whether Jones and Ware ever met, or the terms of the agreements at issue. Moreover, unlike *Ashburn*, the court in this case had the added benefit of audio and video recordings, which gave the court the ability to consider real-time reactions and statements. Therefore, while the disputes in this case are sharp, they are not as extreme and wide ranging as the disputes in *Ashburn*. For these reasons, *Ashburn* does not mandate a remand for the court to conduct an evidentiary hearing.

In sum, the trial court did not abuse its discretion by failing to hold an evidentiary hearing.

## DISPOSITION[7]

The judgment is affirmed.  Costs on appeal are awarded to respondent pursuant to California Rules of Court, rule 8.278(a)(2).

POOCHIGIAN, Acting P. J.

WE CONCUR:

SMITH, J.

DE SANTOS, J.

---

[7] If there is no valid arbitration agreement, whether the terms of a purported arbitration agreement are unconscionable does not matter because arbitration cannot be ordered without a valid agreement.  (See *Avery v. Integrated Healthcare Holdings, Inc.* (2013) 218 Cal.App.4th 50, 71; see also *Avila*, *supra*, 20 Cal.App.5th at pp. 843–844 [explaining that the existence of a valid arbitration agreement is a threshold question that must be answered before parties can be ordered to arbitrate].)  Because we affirm the trial court's order that appellants failed to demonstrate a valid agreement to arbitrate, we do not address Solgen's argument that the court erred by additionally finding the installation contract to be unenforceable as unconscionable.

# <u>CERTIFIED FOR PUBLICATION</u>

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MARY ANN JONES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SOLGEN CONSTRUCTION, LLC et al.,<br><br>    Defendants and Appellants. | F085918<br><br>(Fresno Super. Ct.<br>No. 22CECG01590)<br><br>**ORDER GRANTING REQUEST<br>FOR PUBLICATION** |

As the nonpublished opinion filed on February 2, 2024, in the above entitled matter hereby meets the standards for publication specified in the California Rules of Court, rule 8.1105(c)(2), it is ordered that the opinion be certified for publication in the Official Reports

POOCHIGIAN, Acting P. J.

WE CONCUR:

SMITH, J.

DE SANTOS, J.