Filed 3/19/26  Supporters Alliance etc. v. City of Inglewood CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SUPPORTERS ALLIANCE FOR ENVIRONMENTAL RESPONSIBILITY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CITY OF INGLEWOOD et al.,<br><br>Defendants and Respondents;<br><br>PRAIRIE STATION, LLC,<br><br>Real Party in Interest and Appellant. | B345195<br><br>(Los Angeles County Super. Ct. No. 23STCP00195) |

APPEAL from an order of the Superior Court of Los Angeles County, Curtis A. Kin, Judge.  Affirmed.

Allen Matkins Leck Gamble Mallory & Natsis and Patrick E. Breen for Real Party in Interest and Appellant.

Lozeau Drury, Michael R. Lozeau, and Richard T. Drury for Plaintiff and Respondent.

Supporters Alliance for Environmental Responsibility (SAFER) successfully challenged the City of Inglewood and City Council of the City of Inglewood's (collectively, the City's) decision to prepare and adopt a mitigated negative declaration, rather than an environmental impact report, for a new housing development.  The trial court subsequently awarded SAFER $165,072.50 in attorney fees pursuant to Code of Civil Procedure section 1021.5 (Section 1021.5).  The developer and real party in interest Prairie Station LLC (Prairie) appeals the fee award and we consider (1) whether the trial court gave due weight to factors identified in the Housing Accountability Act (HAA) (Gov. Code,[1] § 65589.5) when assessing whether the lawsuit conferred a significant benefit on the public or a large class of persons and (2) whether SAFER's links to trade unions gave it a financial incentive to litigate that should have foreclosed an award of Section 1021.5 fees.

## I.  BACKGROUND

### A.    *The Project*

The 5.07-acre project site is located at the intersection of Prairie Avenue and 113th Street in Inglewood.  It is bordered by Interstate 105 (I-105) to the southwest, a freeway ramp to the north, Prairie Avenue to the east, and a residential property to the northeast.

The site's zoning designation under the City's general plan is "Airport Commercial," meaning there can be no newly constructed residential uses without a general plan amendment

---

[1]     Undesignated statutory references that follow are to the Government Code.

and a zoning change.  The surrounding area is primarily commercial, and nearby uses include a hotel, a grocery store, and a car dealership.  Structures previously occupying the site included two commercial buildings, two single-family dwellings, an equipment building, a sign, and an antenna.  Most of these have been demolished, leaving a parking lot and a one-story commercial building that is unoccupied.

The project was to include three apartment buildings with a total of 440 apartments.  Each building was to have one or two floors of parking and six stories of residential units.  There was to be open courtyard space on the second floor of each building.  There were to be up to 670 parking spaces, including approximately 100 surface parking spaces.  Pursuant to a disposition and development agreement between the City and a Prairie affiliate—by which the affiliate would acquire a portion of the site from the City for $3.75 million—40 of the units were to be restricted for occupancy by lower- and moderate-income households.

### B.    Project Approval

The City's approval of the project involved several discretionary actions implicating the California Environmental Quality Act (CEQA).  (Pub. Resources Code, § 21080, subd. (a).)  These included approving the disposition and development agreement, amending the general plan, and approving a zoning change.  In August 2021, the City made an initial study and mitigated negative declaration (IS/MND) available for public review and comment.  In October 2022, the City made a revised IS/MND draft available for public review and comment.  The revised IS/MND assessed the Project's environmental impacts to

be "less than significant" as mitigated, which would obviate the need for preparation of an environmental impact report (EIR). (Pub. Resources Code, § 21064.5.)

Counsel for SAFER submitted a series of comments during the public comment period on the revised IS/MND. One of these, dated October 27, 2022, asked the City to prepare an EIR because "the IS/MND fails as an informational document" and "there is a fair argument that the Project may have adverse environmental impacts." (SAFER did not specify any potentially significant environmental impacts in this letter.)

On December 19, 2022—after the public comment period closed and one day prior to a public hearing on the disposition and development agreement and IS/MND—counsel for SAFER submitted a letter detailing "significant, unmitigated environmental impacts [that] the [IS/MND] . . . failed to adequately address." These included "cumulatively significant health risks to future Project residents that would result from exposure to indoor formaldehyde emissions and diesel particulate matter emissions from the immediately adjacent I-105 freeway; insufficient mitigation of health risks to future Project residents and area residents resulting from the Project's future construction and operational emissions; significant impacts to at least three special-status species living on or near the Project site; and insufficient mitigation of the Project's significant greenhouse gas and energy impacts." SAFER's letter enclosed reports from several independent experts. SAFER's attorney also reiterated the letter's concerns at the public hearing held the next day.

The administrative record does not show there was any substantive consideration by the City of the concerns SAFER

4

raised. Minutes from the public hearing simply reflect a general response by planning manager Mindala Wilcox (Wilcox), who "stated that several comments were received when the Draft MND was released and made available to the public" and "when the initial MND was prepared, it was based on the current state and the city's best practices in compliance with CEQA."[2]

The City Council voted unanimously to approve the disposition and development agreement and to adopt the revised IS/MND.

### C. Litigation

After the City's approval, SAFER petitioned the trial court for a writ of mandate to compel the City to vacate and set aside its project approval and to prepare an EIR. SAFER argued there was substantial evidence of a fair argument that the Project would have significant adverse impacts relating to biological resources, greenhouse gas emissions, and indoor emissions of formaldehyde and the City lacked substantial evidence to conclude emissions of diesel particulate matter would not result in significant cancer risks.

The City, joined by Prairie, opposed the petition, arguing SAFER's petition suffered from several procedural flaws. Among other things, they argued SAFER lacked standing and failed to plead and prove exhaustion of administrative remedies (chiefly by failing to timely submit comments). They did not address the merits of SAFER's CEQA-related contentions.

---

[2] The administrative record does include emails between Wilcox and others circulating SAFER's December 2022 letter without substantive comments.

On July 17, 2024—one day before the trial court ruled on SAFER's writ petition—Patrick Breen (Breen), counsel for Prairie, filed a declaration stating Prairie "determined within the last several days that the project at issue in this litigation is no longer economically viable because of high interest rates, tight or unavailable credit, low loan-to-value loan capability, much higher construction costs (labor and materials), and low rents for the project." Prairie therefore would "not be proceeding with the project," and it was "exploring what next steps should be [taken] to vacate the multifamily approvals."

The following day, the trial court granted SAFER's petition. With respect to the City and Prairie's procedural arguments, the trial court determined SAFER alleged and proved public interest standing and exhausted its administrative remedies by raising its concerns before the close of the public hearing.

As to the merits of SAFER's petition, the trial court focused on impacts to biological resources, greenhouse gas emissions, and indoor emissions. Relying on the expert reports accompanying SAFER's December 2022 letter to the City, the trial court determined there was substantial evidence of a fair argument the Project would have significant adverse environmental impacts.[3]

---

[3]     As set forth in the CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.; hereafter, Guidelines), an EIR is required where, among other things, there is substantial evidence that a project "has the potential to substantially degrade the quality of the environment[,] substantially reduce the habitat of a . . . wildlife species[,] cause a . . . wildlife population to drop below self-sustaining levels[,] threaten to eliminate a[n] . . . animal community[, or] substantially reduce the number or restrict the range of an endangered, rare or threatened species." (Guidelines, § 15065(a)(1).) The Guidelines define "substantial evidence" to

6

The court determined there was "substantial evidence of a fair argument that the [p]roject has the potential to substantially reduce the habitat of wildlife species, cause a wildlife population to drop below self-sustaining levels, threaten to eliminate an animal community, and substantially reduce the number or restrict the range of an endangered, rare, or threatened species." Further, in light of missing documentary support for the City's threshold for significant greenhouse gas emissions—and the fact that expected emissions would exceed thresholds adopted elsewhere—there was a fair argument the [p]roject's greenhouse gas emissions would have a significant cumulative effect on the environment. And "[b]ased on the toxic indoor formaldehyde emissions that may result from the [p]roject, as well as the cumulative impact with the emissions from the I-105 freeway, a fair argument [could] be made that the [p]roject may cause substantial adverse impacts on human beings."

The trial court entered judgment in SAFER's favor and issued a peremptory writ of mandate ordering the City to vacate and set aside its certification of the IS/MND and approval of the project. The trial court further ordered the City to prepare and circulate an EIR in the event that it reconsiders the project.

_____

mean "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. Whether a fair argument can be made that the project may have a significant effect on the environment is to be determined by examining the whole record before the lead agency. . . ." (Guidelines, § 15384(a).)

*D.    Attorney Fees Award*

SAFER moved for attorney fees pursuant to Section 1021.5. As we will discuss in more detail, the statute allows a court to award attorney fees to a successful party against one or more opposing parties in an action enforcing an important right affecting the public interest if a significant benefit has been conferred on the general public or a large class of persons and the necessity and financial burden of private enforcement are such as to make the award appropriate. SAFER's proposed lodestar attorney fees amount was $330,145.00, and it requested a 1.5 multiplier.

The City and Prairie opposed the fees motion. In addition to challenging the reasonableness of the attorney fees requested, they argued SAFER's lawsuit did not confer a significant benefit on the general public and the financial burden of private enforcement did not make a fee award appropriate.[4]

With respect to the significant benefit element, Prairie argued the "technical, procedural victory" of a writ of mandate "commanding the City, should it elect to consider the proposed Project, to prepare and circulate an [EIR]" did not constitute a significant benefit.[5] Moreover, Prairie argued the trial court's

---

[4]    The City also argued SAFER was not a successful party within the meaning of Section 1021.5 because Prairie abandoned the project before the trial court ruled on the petition. The trial court rejected this argument, and Prairie does not reprise the argument on appeal.

[5]    The City advanced a similar argument that SAFER could not "show that, after the abandonment of [a] 400 unit housing project, a 'significant benefit' was conferred on the general public worth $414,000 to the people of the City of Inglewood."

8

analysis must account for the HAA, which requires courts considering a fee award under Section 1021.5 to "give due weight to the degree to which the local agency's approval furthers policies" promoting urban development, the suitability of the site for housing development, and the reasonableness of the local agency's actions.  (§ 65589.5, subds. (a)-(c), (p)(1).)  Prairie argued the Project would have created hundreds of dwelling units in an existing urban area near public transportation and other amenities.

With respect to the financial burden element, Prairie argued "all of SAFER's officers are also officers and employees of . . . Laborers International Union of North America" (LIUNA). Prairie contended SAFER serves as a "front for L[I]UNA's Southern California District Council of Laborers [(SCDCL)] . . . and its local unions in Southern California." According to Prairie, SAFER routinely "threatens or files a CEQA lawsuit that has the potential to significantly delay (if not kill) a project, [and] then uses this leverage to demand that developers enter into [project labor agreements] providing favorable terms for L[I]UNA laborers."[6]

Prairie requested judicial notice of more than a dozen documents purportedly establishing SAFER's ties to LIUNA and affiliated unions and their alleged abuse of CEQA.  As described in Prairie's request for judicial notice and its opposition to SAFER's motion for attorney fees, these documents include

---

[6] The City offered a more cursory argument that "SAFER provide[d] no information about itself or its members for th[e] court to evaluate the financial burden of private enforcement on its organization."

9

complaints "alleging that L[I]UNA violated [a]nti-[t]rust and RICO laws by filing repeated sham litigation under the guise of [CEQA]" (Exhibits A and B); SAFER's articles of incorporation, which include a mailing address shared with SCDCL and the signature of an attorney who represented a union in one of the federal lawsuits (Exhibits C and D); various public filings showing "all of SAFER's officers have also been officers or employees of L[I]UNA, its [SCDCL], or its local unions in Southern California" (Exhibits E-J); SAFER's tax returns for several recent years showing "its primary source of revenue (other than 'settlement income') was contributions from the SCDCL" (Exhibits I, K-N); "[a] list of cases filed by SAFER in California Superior Courts since January 2019" (Exhibit O); a webpage titled "Phony Union Tree Huggers" purporting to compile SAFER's "submittals to courts and local agencies concerning alleged CEQA violations" (Exhibit P); and comments on a separate project under consideration by the City of Los Angeles submitted on behalf of both SAFER and LIUNA (Exhibit Q).

In addition to these materials, Prairie submitted another declaration from its attorney Breen. He declared attorneys at his firm "spoke with a number of attorneys who have represented developer clients in administrative or legal proceedings where SAFER alleged that various aspects of their clients' development project[s] violated CEQA. Those attorneys informed [Breen's firm] that, in order to settle these matters, SAFER required that their clients enter into [p]roject [l]abor [a]greements . . . . Those [agreements] are typically kept confidential. When [Breen and his colleagues] asked these attorneys to file declarations in

10

support of Prairie's [o]pposition, they declined to do so, out of concern that might prejudice their clients."[7]

In its reply, SAFER argued its alleged ties to organized labor did not demonstrate any of the relevant unions could expect to benefit from this litigation for purposes of Section 1021.5. In addition, one of SAFER's attorneys filed a declaration stating SAFER never proposed a project labor agreement to settle this matter.

The trial court ruled it would award SAFER attorney fees, but not in the amount requested. The court applied a negative multiplier and reduced the award to $165,072.50.[8]

In making the fee award, the trial court expressly found all prerequisites to award fees under Section 1021.5 were satisfied, including the two disputed by Prairie: whether the lawsuit conferred a significant benefit on the general public or a large class of persons and whether the necessity and financial burden of private enforcement made an award appropriate. The trial court reasoned that enforcing CEQA conferred a significant benefit on the general public and the HAA did not preclude a fee award because the court "[could not] find that the City acted in

---

[7] If the trial court determined it was "unable to fairly evaluate SAFER's financial interests," Prairie asked the court to continue the hearing on SAFER's fee motion so that Prairie could conduct "limited discovery on this issue."

[8] The trial court reasoned that, "[a]t its core, this case involved a straightforward analysis of whether an EIR was required" and "the difficulty of the case [did] not warrant a lodestar of $330,145." Moreover, "an across-the-board negative multiplier [was] warranted" because the "lodestar figure [was] overstated . . . ."

11

good faith in approving the Mitigated Negative Declaration." The trial court explained that, "[d]espite [SAFER] having presented substantial evidence of a fair argument that the project as mitigated may have a significant impact on the environment, the City Council voted to adopt the Mitigated Negative Declaration. The fact that the City Council may have disagreed that the project as mitigated would have a significant effect on the environment did not relieve the City and real party from having to prepare an EIR, especially when the definition of 'substantial evidence' allows for differing opinions. [Citation.]" With respect to SAFER's financial interests, the trial court denied Prairie's request for judicial notice as unnecessary to the resolution of the issues before it. Although the trial court acknowledged Prairie "certainly raised concerning ties between [SAFER] and labor unions that might beg the conclusion that [SAFER] has sufficient pecuniary interest in bringing CEQA challenges to development projects to defeat a claim for fees under [S]ection 1021.5," there was no admissible evidence to support the hearsay assertion in Breen's declaration that SAFER leveraged CEQA actions to extract project labor agreements from developers. Moreover, "the evidence before the [c]ourt d[id] not demonstrate that [SAFER] ever leveraged the instant action to obtain concessions from [Prairie]."

## II. DISCUSSION

Prairie's appeal of the attorney fee award is limited to the question of whether SAFER is eligible for fees at all under Section 1021.5; the amount of the fee award is unchallenged. As framed, the issues are the same as they were in the trial court: whether the lawsuit conferred a significant benefit on the general

12

public or a large class of persons (giving due weight to considerations identified in the HAA) and whether SAFER's costs were out of proportion to its financial interest in the litigation. With respect to the latter issue, Prairie further contends the trial court should have granted its request for judicial notice or, in any case, permitted limited discovery. We review these rulings for abuse of discretion. (*Keep Our Mountains Quiet v. County of Santa Clara* (2015) 236 Cal.App.4th 714, 737.)

As to the significant benefit element, Prairie contends the trial court did not give due weight to pro-housing objectives expressed in the HAA and instead treated the City's CEQA violation as conclusive evidence of a countervailing factor—that the City acted unreasonably. The argument lacks merit because the administrative record establishes the City never engaged at all with the issues SAFER raised. It was within the trial court's discretion to conclude this lack of engagement (not the mere fact of a CEQA violation) was unreasonable and outweighed the other considerations identified in the HAA.

As to SAFER's financial interest in the litigation, Prairie contends SAFER was required to disprove any association with trade unions and, in any case, its request for judicial notice established (or further discovery would have established) such a link. It was within the trial court's discretion, however, to conclude the fact and amount of any benefit to SAFER's asserted backers was too speculative to preclude a fee award and that neither the documents furnished by Prairie nor additional discovery would show otherwise.

13

*A. The Trial Court Properly Applied the HAA in Determining the Lawsuit Conferred a Significant Benefit on the General Public or a Large Class of Persons*

*1. Legal framework*

"An important exception to the American rule that litigants are to bear their own attorney fees is found in [S]ection 1021.5," which "'codifi[es] . . . the private attorney general doctrine of attorney fees developed in prior judicial decisions. [Citation.]'" (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 565, fn. omitted.) Section 1021.5 provides, in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if . . . a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons . . . [and] the necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . ."

"In the CEQA context, courts have held that actions requiring a governmental agency to analyze or reassess environmental impacts associated with a proposed project confer a significant benefit. [Citations.]" (*Keep Our Mountains Quiet*, *supra*, 236 Cal.App.4th at 737-738.) But as we have already mentioned, the HAA imposes additional requirements for an award of fees under Section 1021.5 "in a case challenging a local agency's approval of a housing development project . . . ." (§ 65589.5, subd. (p)(1).) That is, "in weighing whether a significant benefit has been conferred on the general public or a large class of persons and whether the necessity of private

14

enforcement makes the award appropriate, [the court] shall give due weight to the degree to which the local agency's approval furthers policies of [the HAA], . . . the suitability of the site for a housing development, and the reasonableness of the decision of the local agency."  (§ 65589.5, subd. (p)(1).)

The HAA policies to which section 65589.5, subdivision (p) refers generally concern housing costs and the role of local government in constraining supply.  (§ 65589.5, subds. (a)-(c).) Prairie emphasizes two of these: subdivision (a)(2)(K)'s discussion of the need "to significantly increase the approval and construction of new housing for all economic segments of California's communities" and subdivision (c)'s discussion of "the policy of the state that development should be guided away from prime agricultural lands" and "local jurisdictions should encourage, to the maximum extent practicable, in filling existing urban areas."

The HAA declares "[i]t is the intent of the Legislature that attorney's fees and costs shall rarely, if ever, be awarded if a local agency, acting in good faith, approved a housing development project that satisfies" certain conditions.  (§ 65589.5, subd. (p)(1).) It is undisputed here that the Project would have satisfied at least one of the relevant conditions.[9]

The HAA provides that it is to "be interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, housing." (§ 65589.5, subd. (a)(2)(L).)  Nonetheless, the HAA also provides

---

[9]     For instance, the Project's density exceeded "15 dwelling units per acre."  (§§ 65589.5, subd. (p)(1), 65589.5.1, subd. (a)(3), 65589.5.2, subd. (a)(3).)

15

it does not relieve local agencies from complying with CEQA. (§ 65589.5, subd. (e).)

### 2.     *Analysis*

Prairie contends the trial court failed to give due weight to the HAA policies and the suitability of the site for a housing development; instead, Prairie believes the court "collaps[ed]" the issues "into the statutory 'reasonableness' analysis required under . . . section 65569.5, subd[ivision] (p)(1) . . . ."  Moreover, Prairie contends the trial court misconstrued the reasonableness prong to mean that any CEQA error at all is "unreasonable *per se* for fee purposes."  These arguments lack merit.

The trial court did not discuss whether the City's action furthered the HAA's objectives, but that does not mean it failed to give these considerations their due weight.  There is no statutory requirement that the trial court expressly discuss these factors, and we presume the trial court followed the law absent any indication to the contrary.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Peake v. Underwood* (2014) 227 Cal.App.4th 428, 447; *Keep Our Mountains Quiet*, *supra*, 236 Cal.App.4th at 737 [a fee award under Section 1021.5 is reviewed for abuse of discretion, and """"the reviewing court will infer all findings necessary to support the judgment"""""].)

There is no such indication in the record, so we proceed on the understanding that the court understood the City's approval actions advanced HAA objectives but believed some award of fees was still warranted because the unreasonableness of the City's approval outweighed those policy considerations.  Contrary to Prairie's argument, there is no reason to think the trial court believed the City's unreasonableness was established by the mere

16

fact of any CEQA violation.  Rather, the trial court appears to have concluded this was a particularly egregious CEQA violation.[10]  (*Coalition of Pacificans for an Updated Plan v. City Council of the City of Pacifica* (2025) 117 Cal.App.5th 647, 672-673 ["a trial court may properly find a local agency acted unreasonably, for purposes of the fee inquiry under section 65589.5, subdivision (p)(1), if it approved a housing development project without conducting adequate review of its environmental impacts" and explaining "[t]his does not mean . . . that '*any* CEQA error' will establish that a local agency acted unreasonably"].)

There is adequate record support for the trial court's discretionary determination of unreasonableness that justified some award of attorney fees.  SAFER submitted evidence that an EIR was required to consider several of the Project's potential impacts, its counsel raised these issues again at the public hearing, and there is nothing in the administrative record to suggest the City gave *any* consideration to this input.  Though Prairie casts the City's CEQA error as a "technical fault rather than a wholesale failure of reason" because "the City prepared an IS/MND, solicited and responded to public comments, . . . [and] held a noticed hearing before approving the Project," Prairie still cannot point to anything suggesting the City actually engaged with the documents SAFER provided, or that the City had good

---

[10]     As we have already mentioned, neither Prairie nor the City opposed SAFER's petition for a writ of mandate on the merits.

17

reason to ignore them.[11]  The trial court could reasonably determine that soliciting community feedback on an IS/MND but then failing to consider it was unreasonable even in the light of the Legislative guidance provided in the HAA.

>    B.    *The Trial Court Did Not Abuse Its Discretion in*
>          *Determining the Financial Burden of Enforcement*
>          *Made a Fee Award Appropriate Regardless of Any*
>          *Relationship Between SAFER and Unions*
>          1.    *Legal framework*

Section 1021.5's requirement that "the necessity and financial burden of private enforcement . . . are such as to make the award appropriate" involves two issues: ""whether private enforcement was necessary and whether the financial burden of private enforcement warrants subsidizing the successful party's attorneys.'" [Citations.]" (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1214-1215.)  Prairie's contentions concern the latter of these issues.

"In determining the financial burden on litigants, courts have quite logically focused not only on the costs of the litigation but also any offsetting financial benefits that the litigation yields or reasonably could have been expected to yield.  '"An award on the 'private attorney general' theory is appropriate when the cost of the claimant's legal victory transcends his personal interest, that is, when the necessity for pursuing the lawsuit placed a burden on the plaintiff 'out of proportion to his individual stake

---

[11]    Prairie does not claim the City was free to disregard SAFER's December 2022 letter because it was submitted after the close of the public comment period.

18

in the matter.' [Citation.]'" [Citation.] 'This requirement focuses on the financial burdens and incentives involved in bringing the lawsuit.' [Citation.]"[12] (*Whitley*, *supra*, 50 Cal.4th at 1215.)

Although a party's *eligibility* for attorney fees under Section 1021.5 is a binary question—whether litigation costs transcend personal financial interest—the *amount* of a fee award is not. Courts have held that where a "plaintiff[']s[ ] potential benefit was such that individuals in their position could reasonably have been expected to incur attorney fees if the amount of the fee bore a more reasonable relation to such benefit, the trial court, in awarding fees under [S]ection 1021.5, may deduct from the total reasonable attorney fee an amount reflecting the fee that [the] plaintiff[ ] could reasonably have been

---

[12] A plaintiff's financial interest is not limited to monetary relief sought in the litigation. (*Heron Bay Homeowners Assn. v. City of San Leandro* (2018) 19 Cal.App.5th 376, 390-391.) Relevant financial interests also are not limited to those of the named plaintiff. (*Torres v. City of Montebello* (2015) 234 Cal.App.4th 382, 405 ["the court may consider evidence that the named plaintiff is litigating the action primarily for the benefit of nonlitigants with a financial interest in the outcome"].) At the same time, a plaintiff is not "'cut off from the benefits of [S]ection 1021.5 whenever they pursue litigation that might someday help them further or secure their property interests.'" (*Keep Our Mountains Quiet*, *supra*, 236 Cal.App.4th at 740; see also *Sweetwater Union High School Dist. v. Julian Union Elementary School Dist.* (2019) 36 Cal.App.5th 970, 992 ["No abuse in awarding fees can be found where the facts show 'that the plaintiff's "future money advantage . . . is speculative" [citation], or that the plaintiff's[ ] '"pecuniary benefit will be indirect and uncertain"'"'"].)

expected to bear themselves." (*Woodland Hills Residential Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 942, fn. 13.) In *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, for instance, it was a "close" question of "whether the cost of [the plaintiffs'] legal victory transcend[ed] their personal interests" because, they were "probably the greatest beneficiaries" of the judgment they obtained but they received "no direct pecuniary benefit . . . in the judgment" and "any future money advantage . . . [was] speculative." (*Id.* at 1127-1128.) The Court of Appeal found "no abuse of discretion in the trial court solving this problem by doing what the [defendant] suggested in its opposition to [plaintiffs'] motion for attorney's fees; i.e., reducing fees to reflect the financial interest of [some of the plaintiffs]." (*Id.* at 1128.) The Court of Appeal did not decide, however, whether it was improper for the trial court to make a fees award without first finding the cost of litigation "was out of proportion to [the plaintiffs'] individual stake in the action" because the defendant invited the error. (*Id.* at 1126, 1128.)

In its opposition to SAFER's motion for attorney fees, Prairie cited *Galante* and asked the trial court to reduce any award by 50 percent. The trial court did that (though for stated reasons unrelated to SAFER's financial interest in the litigation, see *ante* at 11-12 & fn. 8)—applying a 0.5 negative multiplier in calculating the amount of fees to be awarded. As we have already mentioned, Prairie does not argue the trial court abused its discretion by not *further* reducing the award—the amount of fees is unchallenged. Rather, Prairie advances only an all or nothing argument: whether SAFER is ineligible for fees at all because the costs of litigation did not transcend the financial benefits of the litigation to its asserted union backers.

20

## 2.    *Analysis*

Prairie argues SAFER did not carry its burden to show the financial burden of its enforcement of CEQA warrants subsidizing its attorneys with a fee award because SAFER provided no evidence concerning whether and to what extent the litigation did benefit its asserted trade union backers.  It was sufficient, however, for SAFER to detail its litigation costs and show that it received no reasonably certain financial benefit from an order requiring the City to prepare an EIR in order for the project to proceed.  (*Heron Bay*, *supra*, 19 Cal.App.5th at 397.)  While Prairie believes SAFER should have also "provide[d] evidence showing that there was no connection between SAFER and the unions" or the trial court should have taken judicial notice of documents offered to prove such a connection or permitted Prairie to conduct limited discovery, these arguments can succeed only if such a connection would establish that SAFER or its backers could expect a financial benefit that would have prompted litigation even without the prospect of an attorney fees award.

In Prairie's view, the documents included in its request for judicial notice show SAFER "had an undisclosed financial interest more than sufficient to justify incurring attorneys' fees in this case" because construction projects (like the ultimately abandoned project here) "can potentially provide hundreds of union jobs and millions of dollars in additional wages and other financial benefits.  CEQA lawsuits can aid unions in their pursuit of these financial benefits by increasing their bargaining power with project owners, leaving project proponents with the Hobson's Choice of either paying millions more in wages and benefits or delaying the project for three more years . . . ."

21

The trial court, however, correctly emphasized the lack of evidence that any party proposed to settle this case with a project labor agreement—notwithstanding what it characterized as SAFER's "concerning ties" to trade unions. Nor is there any evidence suggesting SAFER was in a position to determine the probability of such a settlement when it challenged the City's actions. Calculating "'the probability of success at the time the vital litigation decisions were made'" (*Whitley*, *supra*, 50 Cal.4th at 1215) was not simply a matter of assessing the merits of the CEQA action. Rather, SAFER and its asserted backers' financial incentives at the outset of this case depended on their appraisal of Prairie's interest in settling, fighting, or walking away. It was accordingly within the trial court's discretion to (impliedly) reject as speculative the argument that SAFER and its claimed backers had sufficient incentive to pursue the case in the absence of a fee award. (See *Heron Bay*, *supra*, 19 Cal.App.5th at 395 [holding that "[a]ny benefit [the plaintiff homeowners association and its members] received in the form of avoiding a loss in property values" in lawsuit challenging the defendant city's adoption of an MND in approving a wind turbine "was at least once removed from the results of the litigation" because litigation success did "not guarantee" the project would be altered or abandoned; "[t]he amount of any monetary advantage, therefore, was speculative"]; *Keep Our Mountains Quiet*, *supra*, 236 Cal.App.4th at 740 [affirming fee award to association of homeowners who prevailed in lawsuit challenging the defendant city's adoption of an MND in approving permit for wedding venue because the amount of any avoided loss in property value was speculative and there was no guarantee that requiring an EIR would change the project].)

22

Further, we can assume for the sake of argument that the analysis is not limited to SAFER and its asserted backers' interests with respect to a single project, but to their bargaining position with Prairie and analogous developers more generally. Courts applying Section 1021.5 must, after all, "'realistically assess the litigation'" and adopt a "'practical perspective.'" (*Baggett v. Gates* (1982) 32 Cal.3d 128, 142.) Here again, though, the value of this incremental benefit is speculative. It is determined by a host of factors, including interest rates, material costs, labor supply, the rental market, and the requirements of CEQA itself. It was thus still well within the trial court's discretion to conclude that any financial benefit from challenging the City's failure to prepare an EIR was too speculative to preclude an award of attorney fees, and that neither the documents included in Prairie's request for judicial notice nor any potential discovery would alter that conclusion.[13]

---

[13] To the extent Prairie contends the trial court lacked discretion to deny its request for judicial notice because Evidence Code section 453 requires a court to grant such a request under certain circumstances, the argument lacks merit. The trial court did not abuse its discretion in determining that taking judicial notice of these documents was unnecessary to the resolution of the issues before it. (*Licudine v. Cedars-Sinai Medical Center* (2016) 3 Cal.App.5th 881, 902 [even where Evidence Code section 453 is satisfied, "the trial court retains its usual discretion not to take judicial notice of matters that are irrelevant"].) In any case, Prairie was not prejudiced by any abuse of discretion with respect to its request for judicial notice for the reasons we have discussed.

DISPOSITION

The trial court's attorney fees order is affirmed.  SAFER is awarded costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.

We concur:



MOOR, J.



KIM (D.), J.